STATE OF MONTANA, Plaintiff and Respondent, v. ROBERT WADE JONES, Defendant and Appellant.
No. 10516
Submitted March 13, 1963. Decided December 27, 1963.
387 P.2d 913.

Richard Dzivi (argued), Great Falls, for appellant.

Gene B. Daly, Ralph T. Randono, Deputy Atty. Gen., Great Falls, James Sinclair, Asst. Atty. Gen. (argued), Helena, for respondent.

MR. JUSTICE ADAIR delivered the Opinion of the Court.

This is an appeal from a judgment of conviction of the crime of assault in the first degree.

By information filed July 4, 1961, in the district court for Cascade County, Montana, the defendant, Robert Wade Jones, was charged with the crime of assault in the first degree alleged to have been committed in that county, on the 10th day of July, 1961, in that he then and there did, wilfully, wrongfully, unlawfully and feloniously, with the intent to kill a human being, namely, one Charles Simenson, then a deputy sheriff in and for Cascade County, in the State of Montana, assault the said deputy sheriff, with a loaded firearm, to-wit, a pistol, by shooting at said deputy sheriff, to avoid arrest and confinement, all

done contrary to the form, force and effect of the statute in such case made and provided.

The information further charged that the defendant, Robert Wade Jones, had theretofore been convicted of three separate felonies committed by him in states other than Montana as follows:

(1) That said Robert Wade Jones was, in the State of Texas, previously convicted of the offense of forgery, being a felony and that judgment upon such conviction was pronounced, rendered and made against him on the 6th day of September 1955, for which crime he was sentenced to serve seven years in the State Penitentiary in Huntsville, State of Texas; and

(2) That said Robert Wade Jones was, in the State of California, previously convicted of the offense of burglary in the second degree, being a felony, together with a prior conviction of a felony; that judgment upon said conviction was pronounced, rendered and made against him on the 7th day of May, 1956, for which crime he was sentenced to serve six months to fifteen years concurrently in the State Penitentiary in the State of California; and

(3) That said Robert Wade Jones, was, in the State of Nevada, previously convicted of the offense of robbery being a felony and that judgment upon said conviction was pronounced, rendered and made against him on the 30th day of January, 1959, for which crime he was duly sentenced to serve five to fifteen years in the State Penitentiary in Carson City, State of Nevada.

As to the charges of having suffered three prior convictions for felonies committed by him, in the States of Texas, California and Nevada, the defendant, Robert Wade Jones, admitted that such charges were true, but to the charge of assault in the first degree alleged to have been committed by him in Cascade County, Montana, on the 10th day of July, 1961, the defendant, Robert Wade Jones, entered the plea "not guilty."

On August 4, 1961, the defendant, Robert Wade Jones, by and through his court-appointed counsel, made and filed in the district court for Cascade County, Montana, a written motion requesting a change of the place of trial on the criminal action then and there pending against him to the district court of some county in Montana not adjacent to the County of Cascade, and to a community not influenced by the daily newspapers published in Cascade County, Montana.

The motion seeking a change of the place of trial of said action was grounded upon the supporting affidavit of the defendant, Robert Wade Jones, and upon the affidavit of defendant's counsel, wherein each affiant represented his own conclusions to the effect that the local news media in Cascade County, Montana, had so publicized the criminal action then pending against the defendant Jones that he could not receive a fair trial for the alleged reason that the people of said Cascade County were so prejudiced against him that it would be impossible to obtain a jury in Cascade County that had not already formed an opinion as to said defendant's guilt or innocence.

On August 14, 1961, after a hearing had thereon before the Honorable R. J. Nelson, a judge of the district court in and for Cascade County, the defendant's motion seeking a change of the place of his trial was, by a written order of District Judge Nelson denied but, with the express written proviso that "if at the time of trial prejudice is shown in securing a jury motion may be re-opened."

One week after the making of the above order denying defendant's motion for a change of the place of trial, to wit on August 21, 1961, the defendant, Robert Wade Jones, made, served and filed an affidavit disqualifying Judge Nelson from presiding at defendant's approaching trial upon the alleged grounds and for the alleged reason that said defendant "has reason to believe, and does believe that he cannot have a fair

or impartial hearing or trial before said Judge, because of the bias and prejudice of the above-named Judge."

On the following day, August 22, 1961, Judge R. J. Nelson filed a written request that the Honorable R. V. Bottomly, who was likewise a judge of said district court, assume jurisdiction of the cause and that he try and determine any and all matters in connection therewith until the final determination of the case in said district court and, on the same date, August 22, 1961, District Judge Bottomly, accepted jurisdiction in the action, being district court criminal cause No. 5037 A, which cause thereafter came regularly on for trial on December 4, 1961, in the District Court for Cascade County, Montana, before Judge Bottomly sitting with a jury.

The record before us fails to show that at the time the cause regularly came on for trial in said district court, that any prejudice, or difficulty was either shown, claimed or experienced in securing a fair and impartial jury, nor does the record show any attempt or effort made by either the defendant or his counsel to re-open their earlier motion for a change of the place of trial of the action which original motion Judge Nelson had denied on August 14, 1961, but with the express right reserved and given to re-open such motion at the time of trial on a sufficient showing of prejudice. No prejudice whatever was shown to have resulted from the denial of defendant's original motion for a change of the place of trial of the action.

The jury that had been duly empanelled to try this cause, on December 7, 1961, returned its verdict wherein it found the defendant, Robert Wade Jones, guilty of the crime of assault in the first degree as charged in the information and left defendant's punishment to be fixed by court.

Thereafter the defendant, Robert Wade Jones, was asked by the trial court if he had any legal cause to show why judgment should not be pronounced against him, to which he replied he had none, and, no sufficient cause being shown or appearing, the trial court rendered its judgment adjudging

that the defendant, Robert Wade Jones, was and is guilty of the offense of assault in the first degree as was charged in the information, together with having theretofore suffered the aforesaid three separate and admitted felony convictions "and that he be punished by confinement in the State Prison in Powell County, State of Montana, at hard labor for the period of his natural life."

From the judgment so made and entered on the jury's verdict herein the defendant, Robert Wade Jones, has appealed.

*THE EVIDENCE.* At the trial the State's witnesses testified as follows:

*Jasper Richardson.* The witness Jasper Richardson testified: On July 10, 1961 he was the proprietor and operator of the establishment and restaurant business known as the Village Inn located at the village of Ulm, in Cascade County, Montana at a point on U. S. Highway No. 91 approximately eleven miles southwesterly from the City of Great Falls, Montana.

At that time the witness Richardson's home and place of abode was in the Village Inn and the bedroom which he occupied adjoined the dining room of the Inn.

At or about five o'clock on the morning of July 10, 1961, Richardson, whose Inn was then locked and closed for the night and who was then in his bed, "heard somebody monkeying with the front door latch" on the Village Inn.

Richardson remained in his bed for a short while in an attempt to determine whether or not those making the noise at his front door were about to enter his building, but upon hearing the breaking and crashing of glass at the front door of his place of business, he left his bed and entered the dining room of the Village Inn from where he observed a man running away from his front door.

This door was made of Philippine mahogany and it had glass windows. Upon inspecting such door Richardson discovered that the lower glass in the door had been broken. Thereupon, being unarmed, Richardson went into the back

room of his Inn where he waited until he heard the motor of an automobile start whereupon he ran to a window in time to take a fleeting look at the departing automobile which he observed was a 1958 Chevrolet, Biscayne Model.

When asked as to the color of the automobile, Richardson testified: "Not being acquainted with car colors I would call it a gunmetal green or blue." Richardson also observed that the man who was then driving the automobile had on a yellow shirt and that he had dark hair.

Richardson immediately telephoned the sheriff's office at Great Falls, the county seat of Cascade County, Montana, giving a description of the aforesaid 1958 model Chevrolet automobile and its driver and reporting that such automobile and its two occupants were headed toward Great Falls. However, while thus engaged in his telephone conversation with the sheriff's office, Richardson observed that the described Chevrolet automobile had been turned around and that it was being driven back through the village of Ulm on said U. S. Highway No. 91, traveling in a southwesterly direction toward the town of Cascade in Cascade County, Montana, which town is located some sixteen miles southwest of Ulm and about twenty-seven miles southwest of Great Falls. As it passed his Inn, and was proceeding toward the town of Cascade, Richardson observed that such 1958 model Chevrolet automobile bore out-of-state license plates but at that time he was unable to determine all the figures on the license plates other than the figure "9" and the letter "J" all of which information Richardson promptly telephoned to said sheriff's office.

*Deputy Sheriff Charles Simenson:* The witness Charles Simenson testified: On July 10, 1961, he was in the employ of the Cascade County Sheriff's Office, as a deputy sheriff then residing and stationed at the town of Cascade.

At about 5:00 o'clock in the morning of July 10, 1961, Deputy Sheriff Simenson, at the town of Cascade received a call from the Sheriff's Office at Great Falls, Montana, informing said

162

deputy that there had been an attempted break-in at the Village Inn at Ulm and giving him a description of both the 1958 Chevrolet automobile involved and of the driver thereof whom the disturbed Innkeeper Richardson had reported was then wearing a yellow shirt.

In response to such call Deputy Sheriff Simenson immediately got underway and, at about 5:05 A.M., he headed his automobile down U. S. Highway No. 91 traveling in a northeasterly direction toward the village of Ulm. When he had proceeded but about a half mile out of the town of Cascade said deputy sheriff met and passed a 1958 model Chevrolet automobile which fit the description given him of the one reported to have been involved in the attempted break-in of the Village Inn at Ulm and whose driver, the officer noted, was then wearing a yellow shirt.

At this sudden and unexpected turn of events Deputy Sheriff Simenson, riding alone, promptly turned his car around and followed the 1958 Chevrolet with its two male occupants back into the town of Cascade where said 1958 Chevrolet, then bearing out-of-state license plates No. 9J1454, left the business section of the town and turned to the right into the town's residential area where Deputy Sheriff Simenson stopped the 1958 Chevrolet and its two occupants, with his officer's siren.

Upon thus halting the 1958 Chevrolet, Deputy Sheriff Simenson stepped out of his own car and walked to the driver's side of the 1958 Chevrolet, where he exhibited his deputy sheriff's badge to the two occupants of the 1958 Chevrolet and, after informing them that he was from the sheriff's office, he asked the driver of the car to show his driver's license but was told by such driver that he had no driver's license.

The deputy sheriff then asked the occupants of the 1958 Chevrolet if they had been at the village of Ulm about a half hour or so before and both occupants replied that they did not even know where such place was.

Deputy Sheriff Simenson testified: "* * * at that point I

asked if they would drive back to the truck stop, explained to the driver where it was, he said he knew where it was, I got back in my car and followed them to the truck stop where we stopped.

"On stopping at the truck stop I radioed the office a description of the car, the license number, that we were at Cascade, I was told to wait for another deputy.

※ ※ ※ ※ ※

"After I radioed in my information I got out of my car and walked up to the passenger side of the other car, at that point one of the occupants asked me what was going on, I told him I didn't know exactly, another deputy was on the way out, as soon as he got there we would get it straightened out."

※ ※ ※ ※ ※

Again: "I walked up to the door of the car, that's when we were at the truck stop, I told the driver that we were going to wait there, that another deputy was coming out, when he got there then we would get this straightened out.

"Q. By this straightened out, did you indicate what this might concern? A. Previous to that I inquired if they had been in Ulm at the Village Inn. ※ ※ ※ Well they understood we were going to wait until another deputy came out. ※ ※ ※

"Q. Did you at any time indicate why? A. Not other than asking them about Ulm and the Village Inn.

※ ※ ※ ※ ※

"The passenger asked if he could get out and walk his dog. I told him he could, as he got out of the car he walked behind their car in front of mine over to the passenger side.

※ ※ ※ ※ ※

"The passenger got out, he was wearing a hip length coat that he had partly zipped up, he was acting peculiar, holding it in a manner as if to conceal something. I asked him to unzip his coat, he didn't seem to understand so I reached over to unzip the jacket at that time I placed my hand on one shoulder, he turned around and put his hands up on the car.

※ ※ ※ ※ ※

164

"Placed both my hands under his armpits and brought them down, frisking him. Checking to see if he had any weapons.

＊ ＊ ＊ ＊ ＊

"Both my hands came to his hips, my right hand touched something, this object underneath his coat was a bulky item, I couldn't definitely tell what it was, at the time I had the belief it was possibly a gun; at the same time my hand touched the object he reached for it with his right hand.

＊ ＊ ＊ ＊ ＊

"As he reached for it I brought my right arm in front of his waist, trying to grab his hand and prevent him from getting the object.

＊ ＊ ＊ ＊ ＊

"Well, about that time I could see the driver leaning across the seat, he was still sitting on the driver's side leaning across the car.

＊ ＊ ＊ ＊ ＊

"From the position we were I could see he had a gun on the inside so I let go of the passenger's hand, brought my arm around his waist trying to hold him as a shield and at the same time went for my gun.

＊ ＊ ＊ ＊ ＊

"We were scuffling, I don't know exactly what, the next thing I was falling backwards.

＊ ＊ ＊ ＊ ＊

"As I was falling backwards I had my gun out and the passenger turned facing me, he had his gun out at that time in his right hand, he had pulled it out and his gun was in his right hand facing me. ＊ ＊ ＊

"As I was falling backward I fired two or three shots at the passenger as he was facing me, then I tripped and fell over the railroad ties.

"I was falling backward as I fired ＊ ＊ ＊ I tripped over the ties, as I rolled over I was on the ground, he was lying on the ground.

＊ ＊ ＊ ＊ ＊

"I seen him lying there and I glanced at the car and the driver of the car was leaning across the seat firing out the window.

\* \* \* \* \*

"I seen the passenger on the ground, I glanced over and the driver was firing, I was still facing in the general direction of the man on the ground, I was moving my gun over an area of possibly two feet and started shooting at the car.

\* \* \* \* \*

"I had tripped over, rolled over the ties; I was lying on the ground all the time I was shooting."

"\* \* \* I fell over the ties, rolled over, looked up and seen the passenger lying on the ground, I looked over at the defendant sitting in the car, he was already firing.

\* \* \* \* \*

"That's correct, then I turned my gun and started shooting back.

"Q. Do you know how many shots you fired at the defendant in the automobile? A. About three.

"Q. Did you empty your gun? A. That's correct.

"Q. Do you recall what occurred after you emptied your gun? A. About the same time mine was empty his apparently was also because all noise quit at once.

"Q. Do you have any way of determining after going through a thing like that how many shots the defendant fired? A. Yes.

\* \* \* \* \*

"Q. How many would you say that was? A. Approximately seven.

\* \* \* \* \*

"Q. Did you see the defendant's gun as you described it when you say he was firing it? A. I did.

"Q. Did you observe with your own visual observation in which direction it was pointed? A. I did.

"Q. Where was that? A. Right between my eyes.

\* \* \* \* \*

"A. When the firing quit, there was a ditch approximately two feet deep, about two to three yards behind me, I jumped off the ground into the ditch, there was a pile of dirt, I thought I would get behind that, instead I saw this post so jumped up and got behind the post.

\* \* \* \* \*

"As I got behind the post the driver started the car and took off down the highway in the direction of Great Falls.

"Q. What did you do at that time? A. Ran out on the highway, watched the car go out of sight right at the edge of town where there's a little curve, then I got in my car, radioed the office in Great Falls what had taken place.

\* \* \* \* \*

"Q. Where at that time was the fellow that had been a passenger in the car \* \* \* after the automobile pulled away was the passenger still there? A. He was.

"Q. What was he doing? A. Just lying there. \* \* \* After the car took off before running out on the highway I did run up, grabbed the deceased's gun, moved it a short ways away, then ran onto the highway, it didn't take but a couple of seconds. \* \* \* After I radioed in I picked up the deceased's gun, put it in the car, looked around the area, picked up the three cartridges from the .32 and put them in my car.

\* \* \* \* \*

"Q. Did that have any significance to you at that time, finding the ejected cartridges there? A. Finding them there I believed the gun used by the driver was a .32.

"Q. Any particular kind of gun? A. Automatic.

"Q. An automatic will eject its shells as it's fired? A. Yes.

"Q. You found these cartridges lying where what had been the passenger's window from where the gunfire was exchanged? A. That's right.

"Q. You took the deceased person's gun and placed that in your automobile? A. Correct.

"Q. Did you make any further investigation at the scene? A. A little later on, after the body had been removed.

"Q. What did you find? A. Found four more cartridges from the .32.

"Q. Did you find anything else? A. I found a slug in the post.

"Q. Identify the post to us please? A. This post right here (indicating).

"Q. Is that the same one you got behind after the firing? A. Yes.

"Q. Was there any way you could determine whether or not the thing had been recently put there? A. It was a fresh mark in the post.

"Q. Was it a new or old post? A. An old post.

"Q. You made a visual inspection and could determine that? A. Yes.

"Q. Did you remove the slug from the post? A. That's right.

"Q. What did you do with that? A. Took it into the office and put it with the rest of the evidence.

"Q. But at that time you took it into your custody? A. Yes.

"Q. I am going to show you what is marked State's Exhibit No. 2 for identification purposes only, do you recognize that? A. I do.

&ast; &ast; &ast; &ast; &ast;

"Q. You say you recognize this gun? A. Yes.

"Q. When was the first time you saw it? A. The first time I saw it clearly is when it was lying on the ground next to the deceased.

"Q. During your testimony yesterday concerning the evidence of gun fire with the defendant I was left in some confusion concerning intentions, I think the defense counsel asked you if it was your intention to kill this man while exchanging gun fire, I never got your testimony straight; explain to me

168

and the Court what you were doing at that time? A. As I say, I was on the ground, it probably took, I'd have to cut it down into seconds, I thought several things at the time he was shooting at me, I returned his fire, I didn't think about killing him at the time.

"Q. What were you trying to. do? A. I was shooting to draw him off, keep him from hitting me, several things as I was lying there.

"Q. Did you give any thought to your own life? A. Yes.

"Q. Could that have been one of your reasons? A. I was trying to hinder him from hitting me."

*Robert Bruce Morris.* The witness, Robert Bruce Morris, referred to Deputy Sheriff Charles Simenson, by the latter's nickname "Chuck": The witness Morris testified: On July 10, 1961, he, Morris was employed as a gasoline station attendant by the Cascade Truck Stop located in the town of Cascade, Montana, on which date said attendant's working shift began at 12:00 o'clock midnight and ended at 8:00 o'clock on Monday morning, July 10th.

Morris testified that at some time after 5:00 o'clock on the morning of that day he observed a 1958 model Chevrolet followed by Deputy Sheriff "Chuck" Simenson's 1955 Chevrolet, drive up and stop at the Cascade Truck Stop, and, thinking that such cars might be in need of gasoline, Morris came out of his office in the Cascade Truck Stop and walked toward the place where the gasoline pumps were located at which time he observed Deputy Sheriff "Chuck" Simenson standing at the driver's side of the 1958 Chevrolet and engaged in conversation with the driver of such automobile. Next, Morris saw the deputy sheriff walk from the driver's side of the automobile to the passenger's side thereof at which time the witness Morris observed the passenger alight from the right-hand side of the 1958 Chevrolet, whereupon the passenger and the officer exchanged a few words following which the passenger

placed his hands above the rim of the door on the right-hand side of such car.

The witness, Morris further testified: "Chuck was frisking him, as he was frisking him he brought his hands about here, the man brought his hands off the car, brought them around Chuck in the ribs and knocked him backwards.

"Q. You say the man knocked him, Chuck, backwards, you mean the Deputy Sheriff, Mr. Simenson? A. Yes, sir.

"Q. What direction, if you know, did he go backwards? A. Pretty close to this dotted line here, he reeled backwards, I couldn't see everything this man did but he drew his pistol.

"Q. You saw the man that struck the deputy sheriff draw his pistol? A. I didn't see him draw it but I saw it when he come around the side of the car, he had it then.

"Q. What happened next? A. Chuck pulled his pistol as he was falling backwards, I couldn't see this man in here, he had his back turned to me.

"Q. As closely as you remember then what happened? A. Immediately after that Chuck fired two shots over this man's head, and approximately the same time this man started firing out the right hand window at Chuck.

"Q. The sheriff fired two shots over the head of the man outside? A. That's right.

"Q. And at that time the man in the automobile started firing? A. Yes sir.

"Q. Could you determine at whom or what he was firing? A. He was firing at Chuck, the bullets were coming pretty close to Chuck, hitting the ground.

"Q. Did you see the deputy sheriff go down to the ground? A. Yes sir.

"Q. Did you see the man after that at whom you say he fired over the head? A. I saw him fall backwards, he was hit then.

"Q. Which shot of the deputy's, if you know struck the man down? A. The third.

"Q. At this time and during this time the man in the car was firing at the deputy? A. Yes sir.

"Q. Where was the deputy at that time? A. On the ground, about here, started rolling over this way.

"Q. Was he returning the fire? A. Yes sir. * * *

"MR. DALY: Did you see the impact of any bullet fired from the car, where it might have struck in relation to the sheriff?

"WITNESS: The sheriff was lying approximately like this and rolled over some and the bullets were hitting about six to eight inches from him.

"Q. Did you actually observe the bullets strike within six to eight inches of the sheriff? A. Yes sir.

"Q. Was the sheriff returning fire? A. Yes.

"Q. Do you remember who stopped firing first? A. It was pretty close.

"Q. By pretty close do you mean about the same time? A. Yes.

"Q. You testified you gained a position about the center of the road? A. Yes.

"Q. When this started to occur did you change your position? A. Yes, I backed up across the road back into the station.

"Q. You were able to observe this backing up? A. Yes.

"Q. What did you do when you got into the station? A. Put in a call.

"Q. To whom? A. Placed a call to the Highway, it went to the state police.

"Q. Did you have an opportunity to observe the person inside the automobile? A. Not too clearly, sir.

"Q. Did you have an opportunity to determine his hair color? A. Yes sir.

"Q. What would that be in your remembrance? A. Dark brown.

"Q. Did you have an opportunity to observe any kind of wearing apparel? A. I seen a color of a shirt, it was yellow.

"Q. And I believe you told us the make of the automobile was a Chevrolet? A. Yes sir.

"Q. Do you remember the year or color? A. It was a 1958 and it would be pretty close to turquoise.

"Q. Do you recall after retreating to your office and calling the highway patrol what occurred after that with reference to the automobiles, the occupants and so one? A. Before I got on the telephone the Chevrolet was pulling out.

\*　　\*　　\*　　\*　　\*

"Q. In what direction? A. North.

"Q. Toward what town? A. Ulm, Ulm or Great Falls.

"Q. Did you observe the occupant or what he was doing at that time? A. He still had the pistol in his hand and he was out of ammunition.

"Q. How did you determine that? A. He looked like he was trying to take another shot but he didn't have anything to shoot, nothing was happening.

"Q. MR. DALY: I think that's all."

On his cross examination by defendant's counsel the witness, Robert Bruce Morris, in part, testified:

"Q. Did you see Berens fall? A. I saw him when he was hit, I didn't see him fall completely.

"Q. What do you mean, saw him when he was hit? A. I saw his head jerk back.

"Q. You didn't see him fall then? A. He fell fairly fast, I seen him reel back sideways and fall. \* \* \*

"Q. On which of the shots did Berens drop? A. The third.

"Q. You are positive? A. Yes sir.

"Q. How many shots did Deputy Simenson fire before the defendant Jones opened fire? A. I don't know, one or two.

"Q. Do you know where the first two shots which the deputy fired went? A. They went above the head of Berens.

"Q. How do you knew they went above his head? A.

Simenson was falling back and his hand came up, as he fired he was reeling backwards, I seen his hand go up as he was falling.

"Q. On this third shot where was his hand? A. He was on the ground when he shot the third shot.

"Q. That is the shot he hit and killed Berens with? A. Right.

"Q. Do you remember discussing this case with me after this incident occurred? A. Yes sir.

"Q. Isn't it a fact that at that time you told me you could not say of your own knowledge which of the individuals, either Simenson or Jones fired the shot that killed Berens? A. I might have said that.

"Q. That you couldn't tell of your own knowledge who fired the shot that killed Berens, and didn't you just say Deputy Simenson laid on the ground, took careful aim and fired his third shot? A. He dropped at the third shot and was aiming at him. * * *

"Q. Did you ever tell Sheriff John Krsul that Jones fired before Simenson fired? A. No, Jones fired before Simenson fired at Jones. * * *

"Q. How did Mr. Jones accelerate when he drove the car away from the truck stop? A. As fast as it would go. * * *

"Q. Would you say the automobile was floor-boarded at the time? A. It could have been.

"Q. Did he shoot out when he finally left? A. After he hit pavement I believe so. * * *

"Q. Do you know how many shots the pistol which Deputy Simenson used that morning holds? A. Six.

"Q. You say you saw the first two shots go over the cars down the highway? A. His revolver was pointed in a direction that would fire over Berens head.

"Q. You could tell that while he was reeling backwards? A. Yes sir.

"Q. Did his third shot hit Berens in the head, in the mouth? A. Yes sir."

*Robert Wade Jones.* Throughout the trial of this cause, which began on December 4, 1961, the defendant, Robert Wade Jones, was represented by counsel who at the conclusion of the State's case in chief, called the defendant to the witness stand and interrogated him as a witness on his own behalf and he, in part, testified as follows:

He was then twenty-eight years of age and by occupation was a casting machine operator.

Early on the morning of July 10, 1961, the defendant Jones and a traveling companion named David Berens were driving down Highway No. 89 in Cascade County, Montana, in a stolen 1958 model Chevrolet automobile with Jones at the wheel doing the driving.

At approximately 5:00 on that morning the defendant Jones and David Berens turned off the highway at the village of Ulm and stopped in front of the then locked and closed restaurant known as the Village Inn.

Jones had a dog riding with him in the car and his excuse for stopping at the Village Inn at Ulm was to let the dog out and to give him milk.

When Jones alighted from the automobile his companion David Berens likewise stepped out of the car, but where Berens went Jones said he did not know because he wasn't paying any attention to Berens. Jones said that when Berens returned to the car he told Jones that "someone was in this place, let's go," so they re-entered the car and, leaving Ulm, they drove some three or four miles toward Great Falls, but then undergoing a change of mind, Jones the driver turned the car around and drove back through Ulm and thence to the town of Cascade.

As Jones and Berens were entering Cascade their rear view mirror showed they were being followed by a fast approaching car, to which Jones called Berens' attention, whereupon

Berens said: "It looks like a deputy sheriff, turn right at the next intersection."

Jones turned right at the next intersection, as directed, whereupon Berens' surmise proved to be correct, for it was Deputy Sheriff Simenson who likewise turned right at the intersection, and sounded his siren whereby he brought the 1958 Chevrolet to a stop.

Jones testified: "I stopped, he came up to the car, asked for my driver's license. * * * I told him I didn't have it. He asked me to drive back to the truck stop on the highway. I told him I would. * * * I had a gun at the time. I told Mr. Berens I would probably get arrested for traffic violation, and I handed it to him at that time. I didn't see me being booked on two counts if I did get arrested for traffic violation."

"Q. What did Mr. Berens do with the gun you handed him? A. He tried to put it in the glove compartment, it was all full of stuff, we had another gun in the glove compartment which he took out and placed the other one in.

"Q. What was the caliber? A. .380 automatic.

"Q. What was the caliber of the gun in the glove compartment? A. .32.

"Q. How do these compare in size? A. Very near the same, the .380 is very little larger than a .32.

"Q. What did Mr. Berens do with the .32? A. When Berens got the .32, Simenson started up, stopped by the left hand side of my car, he stuck it under his left leg when the deputy walked up to the car.

"Q. What was he attempting to do with the gun? A. I think his intentions was to stick it under the front seat.

"Q. Why didn't he place it with the other one in the glove compartment? A. The other one was in a leather holster, there wasn't room in the glove compartment.

"Q. You did drive back as requested by the deputy? A. I did.

"Q. What occurred when you arrived at the truck stop?

A. Simenson came up on the left side of the car, I asked him why I had been stopped, he told me he didn't know, another deputy was on the way, he said 'we will straighten it all out when he gets here.'

"Q. What happened them? A. Then Berens asked him if he could get out with the dog.

"Q. Then what? A. They got out of the car, Dave got out and the deputy walked around behind the car to talk to Dave.
* * *

"A. I see him standing there talking, I seen the deputy reach for Beren's coat.

"Q. What occurred then, if you recall? A. At that time they stepped out of my line of vision, there were clothes hanging on the right hand side of the car they stepped behind and I seen Dave put his hands up on the car.

"Q. After Dave put his hands on the car what happened? A. The next thing I knew I heard a shot, I leaned over, Dave was falling at that time I looked at the deputy, he was turning to the car with a gun and fired some shots.

"Q. At that time did any shots hit the automobile? A. At that time all I heard was noise, I can't state positively they did.

"Q. What did you do then? A. When I turned for the gun in the car I picked up the .32 lying in the seat, at that time I started firing back up through the window.

"Q. Did you do anything else? A. Reached with my left hand and found ignition started to turn it, turned on the car.
* * *

"Q. Were you firing all this time? A. That I can't say, it's very possible I was.

"Q. Did you see Deputy Simenson after you heard the shot and saw Berens fall dead? A. Yes I did.

"Q. What, if anything, was he doing? A. Kind of running backwards from the car.

"Q. Would you describe it as running or stumbling? A.

More or less stumbling, I remember he had boots on that morning and it seemed like he lost his balance. * * *

"Q. Do you recall where Mr. Simenson was when he stopped firing? A. Standing across from me five or six feet by the telephone pole. * * *

"Q. What did you do when the firing stopped? A. Floorboarded the car and took off, hit the emergency brake to release it.

"Q. Now directing your attention to the first shot you heard, tell me what you did then? A. Looked out the window, seen Dave fall; when he started shooting I started shooting, when I started shooting he was off balance, that was my intention all along, to get him off balance.

"Q. I believe you testified you saw the deputy standing fooling with the loading catch on his revolver? A. That's true.

"Q. Was the .380 loaded? A. Yes it was.

"Q. Did you make an attempt to get the .380? A. No.

"Q. Why didn't you? A. He was out of shells, so was I, I figured I had time to start the car and leave there before he could load and start firing again. * * *

"Q. * * * where was the .32 at the time the firing started? A. When Dave stepped out of the car he laid the gun over on the right hand side close to the door, the right hand side of the car in the front seat.

"Q. This is the pistol he had taken out of the glove compartment to make room for the one you had taken off your person. A. It was, yes. * * *

"Q. When you drove off what did you do with the pistol which you had been firing? A. Just threw it down.

"Q. What did you do as you drove away from the Cascade truck stop? A. I was going pretty fast when I left there, at the intersection in this small town in order to make it I slowed down and turned off on the left, a road going right off the highway.

"Q. What did you do? A. Drove up the road, it did not go

any place but to a ranch house, there was a turn around around the ranch house, I went around it down to the river.

"Q. You do not mean you drove into the river? A. No, to the bank of the river in some brush there, there was a road going to the river where I turned right as I got on the river bank.

"Q. What did you do then? A. Got out of my car.

"Q. Did you take anything with you? A. I did, I took the .380 out of the glove compartment, a box of shells, also took a rifle which was in the back seat and a box of shells for it.

"Q. Why did you take these weapons? A. I already seen Dave get hit up there, and I had a feeling or figured I would be shot on sight if I didn't have some kind of weapons.

"Q. What did you do after you left the car? A. Went down the river to some abandoned car bodies and crawled in there.

"Q. Alone? A. No, I had the dog with me.

"Q. Did you crawl into the car bodies with the dog? A. Yes I did.

"Q. After you crawled into the car bodies what did you do? A. Waited until night, when it got dark I got back out of this old car, went back to where my car was supposed to be.

"Q. Then what? A. When I got there I couldn't locate my car, * * *

"Q. Did you have both weapons which you said you took? A. No, only the revolver.

"Q. What did you do with the rifle? A. Left it laying some place, I can't be sure.

"Q. Why did you abandon it? A. It got too heavy, I didn't feel I needed it anyway after I got to thinking about things. * * *

"Q. Where did you go when you went back across the highway? A. Over into some brush down probably 100 yards or so from that town, I think it's called Cascade dump. * * *

"Q. What occurred after you crawled into the brush and went to sleep? * * *

"A. I raised up, I looked to my right, a man was standing down by the river bottom with a rifle pointed at me.

"Q. What occurred then? A. He pointed the rifle at me, told me 'don't move, I won't hesitate a minute to kill you,' I told him I wouldn't move, he said 'are you armed,' I told him no, my gun was laying in the brush.

"Q. What then? A. He told me to raise my hands, which I did.

"Q. Then what? A. He came up behind me, ordered me to put my hands down behind my back, I did, he put handcuffs on me.

"Q. Were you then taken from the area? A. Yes, I was."

When Mr. Daly, the county attorney, cross-examined him concerning the contents of the stolen automobile which he had driven to the spot near the Missouri River and then abandoned, the defendant Jones, in part, testified:

"MR. DALY: Did you have any other firearms or ammunition in that automobile at the time you were at the truck stop in Cascade, Montana, on July 10th, 1961, when the deputy was talking with you, and also when you abandoned your car?

"WITNESS: Possibly I could have had some more, yes.

"Q. I would like to know whether you did or not? A. I don't know what the contents of that car was at the time.

"Q. Am I mistaken in assuming you were driving that car? A. No, I was driving the car.

"Q. Wasn't it your car? A. No.

"Q. Whose car was it? * * *

"WITNESS: It was a stolen car. * * *

"Q. How long did you ride in that car? A. I can't say for sure.

"Q. Was it several days, a week? A. A few days, yes. * * *

"Q. You are not sure in your own mind if there were guns

in it besides the ones you described? A. I think there were some more rifles in there if I am not mistaken.

"Q. Some more rifles; do you have an estimate as to how many rifles? A. No, I couldn't say. * * *

"Q. What would be your opinion of how many were there? A. Probably three, four, five, I have no idea.

"Q. How about ammunition? A. I think there was ammunition in the car.

"Q. You have no idea how much? A. No."

For his first specification of claimed error on this appeal, the defendant assigns the failure of the trial court to sustain defendant's motion for a change of the place of his trial, which motion was made and denied some four months prior to the opening of defendant's trial. Such motion was grounded upon conclusions advanced by the defendant and by his counsel in separate affidavits made and filed by them some months in advance of defendant's trial.

As heretofore indicated, while, in its order denying defendant's motion for a change of the place of defendant's trial, the trial court expressly provided that "if at the time of trial prejudice is shown in securing a jury this motion may be reopened," yet the fact remains that at no time did the defendant or his counsel make any motion, or attempt to re-open defendant's motion for a change of the place of defendant's trial nor did the defendant at any time supply the trial court with any facts that would warrant the trial court to re-open defendant's original motion for a change of the place of his trial. Accordingly, we find defendant's first specification of error to be wholly lacking in merit.

As his second specification of claimed error the defendant assigns the overruling by the trial court of defendant's objection to allowing the trial court's official court reporter, Philip R. Fordahl, to testify at defendant's trial from a typewritten transcript of oral testimony given by the defendant under oath on the evening of his capture and originally taken

in shorthand by said court reporter who testified that he could not recall the contents of his typewritten transcript without referring to his shorthand notes or to a transcript made by him from his shorthand notes.

To sustain his claim of error, the defendant's counsel had cited R.C.M.1947, § 93-1901-6, and the case of Marron v. Great Northern Ry. Co., 46 Mont. 593, 601, 129 P. 1055, 1056, neither of which governs here.

The statutes which here control are R.C.M.1947, § 93-1901 to 93-1908, both inclusive, as amended by Chapter 22 at pages 123 to 127, Laws of the Thirty-seventh Legislative Assembly of 1961. Also see: Holler v. Miller, (1939), 177 Md. 204, 9 A.2d 250, at pp. 251, 252; Mantell v. State, (1942), 141 Neb. 15, 2 N.W.2d 586, at pp. 587, 588; Schlegel v. State, (1943), 143 Neb. 497, 10 N.W.2d 264, at p. 266; People v. Gardner, (1957), 147 Cal.App.2d 530, 305 P.2d 614, at p. 620; People v. Butcher, (1959), 174 Cal.App.2d 722, 345 P.2d 127, at p. 131.

We find no merit in defendant's specification of error No. 2.

■ As his third specification of claimed error, the defendant assigns the refusal of the trial court to give defendant's proposed Instruction No. 33 wherein defendant sought to instruct the jury thus: "You are instructed that a witness may testify to anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any time when the fact was fresh in his memory and he knew that the same was correctly stated in writing, *but such evidence must be received with caution.*" Emphasis supplied.

As his fourth specification of claimed error, the defendant assigns the refusal of the trial court to give defendant's proposed Instruction No. 33-A, which is simply a rewrite of Instruction No. 33, supra, down to the word "memory" from which point, proposed Instruction No. 33-A reads: "Though he retained no recollection of the particular facts, and he knew

that the same was correctly stated in the writing, *but such evidence must be received with caution.*" Emphasis supplied.

The trial court quite properly refused to instruct the jury that the evidence given by its duly qualified expert court reporter "must be received with caution."

For his fifth and sixth specifications of claimed error, the defendant assigns the giving over defendant's objection of the trial court's instructions No. 10 and No. 11.

The trial court's Instruction No. 10 reads:

"You are instructed that in every crime or public offense there must exist a union or joint operation of act and intent. The intent or intention is a state of mind and every sane person is presumed to intend the natural and probable consequences of his act, and such intent may be inferred from the acts of the person charged with crime as well as by his words or declarations. It is not necessary to a conviction that an express intention be proved. It may be manifested by circumstances connected with the perpetration of the offense without any positive testimony as to express intent. The question of intent is a matter for the jury to determine."

The above-quoted trial court's Instruction No. 10 was approved by this court in the case of State v. Board, 135 Mont. 139, 146, 337 P.2d 924.

The trial court's Instruction No. 11 reads:

"The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity."

We find no error in the giving by the trial court of its above-quoted Instructions No. 10 and No. 11.

Finding no reversible error in the record submitted to this court on the instant appeal, the judgment of the trial court and the sentence imposed by such trial court stand affirmed.

182

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON and CASTLES concur.