No. 81-474

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

SHERRY RILEY,

Defendant and Appellant.

Appeal from: District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

David Nielsen argued, Glasgow, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Chris Tweeten argued, Assistant Attorney General,
 Helena, Montana
Marc F. Racicot, County Prosecutors Service, Helena,
 Montana
James A. McCann, County Attorney, Wolf Point, Montana

Submitted: March 29, 1982

Decided: August 13, 1982

Filed: AUG 1 3 1982

_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Sherry Riley and three codefendants were convicted of deliberate homicide following a jury trial in the Fifteenth Judicial District, State of Montana, in and for the County of Roosevelt. Riley was sentenced to twenty years imprisonment with ten years suspended. From that judgment she appeals.

The fact situation relating to the death of five-year-old James Gill has been stated in a recent opinion of this Court, State v. Powers (1982), ___ Mont. ___, 645 P.2d 1357, 39 St.Rep. 989. Only those facts specifically applicable to Sherry Riley, the appellant here, will be set forth in this opinion.

Appellant, her husband Arthur, and Norma Phillips, were tried jointly. Charges against Norma Phillips were dismissed at the close of the State's case. The jury found Arthur Riley not guilty.

Appellant and her husband were members of a religious group known as the River of Life Tabernacle, which originally was based in Wapato, Washington. James DeLorme, the leader of the church, appointed various persons as "ministers" and "counselors" to assist him in church matters. DeLorme traveled much of the time leaving church operations in the hands of Arthur Riley and the appellant, who served as a "women's counselor." Members of the church lived communally, sharing food and responsibilities for the community. Often several families would occupy the same dwelling.

It was within this framework that church leaders exerted substantial control over the lives of the members.

The leaders established rules regarding members' work, living conditions and expenditures of money. Members were expected to contribute a percentage of their income to the church and to make special contributions for other items needed by the church leaders.

The leaders of the church established a policy on child discipline that evolved from a desire to recruit members. DeLorme determined that well-behaved children would make a good impression on potential converts, and in the fall of 1979, the church began a policy of strict discipline for children of church members. During this period, DeLorme had a group of ten children of church members living at his house because he was dissatisfied with their parents' compliance with his discipline policies. Testimony indicated that he used a spatula and electric cord to discipline the children.

Evidence also was introduced that members would compete with each other in carrying out the discipline policies in an attempt to please DeLorme. Testimony showed that adult members, including DeLorme and the appellant, sat around in a circle and placed a number of small children in the center. Whichever adult a child went to was expected to spank the child and place him back in the center of the circle. Children as young as five months were subjected to this treatment.

Appellant was a central figure in the enforcement of the church discipline policy. She told Pat Lewis, one of the mothers, that Lewis had no authority over her own children and was not to discipline them. Appellant served as disciplinarian when DeLorme was away and undertook the job

of disciplining the Lewis children as well as other children of the commune. Beatings were inflicted on the children with a blue-green fiberglass stick or with an electrical cord and thereafter the children often were hosed down with cold water. James Gill was one of these children.

~~DeLorme, Arthur Riley and the appellant "counseled" Grady and Jennifer Gill, the parents of James, on how to discipline him.~~ The appellant disciplined James on several occasions, both with the fiberglass stick and the electrical cord because he refused to eat. According to the testimony of Pat Lewis, appellant hosed James down after one beating and made him stand in mud for "an hour or so." Another witness, Takkeal, testified that he saw the appellant beat James for "a couple of hours" for refusing to eat and that afterwards James was bruised and appeared unconscious. These incidents occurred prior to the move of the commune to Montana in the fall of 1980.

James Gill was, throughout his short life, a sickly child. He suffered from sickle cell anemia, a hereditary circulation disorder. This condition was known to the church leaders, including the appellant. Dr. Kenneth Mueller, who testified at the trial as an expert in pediatrics and forensic pathology, stated that the disease was "relatively moderate" and that the child would not have died of that disease alone. However, he testified that as a result of the beatings about 20 percent of the child's blood volume seeped from broken blood vessels into the surrounding tissue. This blood loss produced a shock-like effect which, in combination with the sickle cell disease, led to James Gill's death.

*court order*
*9-9-82*
*gkt*

-4-

In the late fall of 1980, the church moved from Wapato, Washington, to Glasgow and Poplar, Montana. The Rileys, the Gills and several other members moved into three units of a motel in Glasgow. They stayed at the motel until sometime in December. Then they gave up two of the units and moved those families, including the Gills, to Poplar where they occupied mobile homes. The appellant and her family kept one unit until January 2, 1981.

Richard Dick, a church member, testified that during the period they were all together in Glasgow he observed the appellant and Don Howtopat beat James with an electrical cord and a stick and that this beating seemed to weaken James.

Appellant testified that after her husband moved their trailer to Poplar sometime in mid-December she spent part of the time in Poplar and part in Glasgow. During this period, James Gill lived at their trailer part of the time. She also testified that during this period that James lived with them she did not spank him. The appellant was in Glasgow most of the time from January 2, 1981 to January 11, 1981, but on Thursday, January 8, she was in Poplar to attend church services. According to her testimony, she saw James in church and he appeared to be perfectly normal. After church, she returned to Glasgow and did not return to Poplar until Sunday, January 11. She learned of James Gill's death Saturday morning.

The appellant testified that on January 9, the day James died, she drove from Glasgow to Fort Benton, Montana, to get one of the church members out of jail. She denied that she had left the children in the charge of Robert

Powers, a defendant in the earlier case. This testimony was controverted by the State through the testimony of Ronald Wilson, a deputy sheriff of Roosevelt County, who testified that shortly after the boy's death Powers told him that the appellant had told him on Thursday night, January 8, to return to the Riley trailer and take care of the children.

Seven issues are presented for consideration:

1. Is the information, as amended, sufficient to properly charge the appellant with the offense of deliberate homicide?

2. Was probable cause sufficiently established in the county attorney's supporting affidavits to permit the court's granting of leave to file an information?

3. Is the jury verdict finding the appellant guilty of deliberate homicide supported by sufficient evidence?

4. Did the trial court err in allowing evidence of other crimes, wrongs and acts of the appellant and of individuals not parties to this action and in denying appellant's motion in limine to exclude such evidence?

5. Did the trial court err in admitting the electrical cords into evidence?

6. Did the trial court err in allowing photographs of the deceased victim into evidence?

7. Did the trial court err in giving Instruction No. 16, which contains a verbatim recital of the amended information?

The original information of January 12, 1981, was amended twice following motions to dismiss. In denying these motions the trial court ruled that: "The affidavits and Information filed by the County Attorney are sufficient

-6-

to give the Defendants notice of the charges against them. The amended Information charges the offenses in the language of the statute. The charging statutes comply with the law." The defendants charged by this information applied to this Court for writs of supervisory control. We accepted jurisdiction and denied the relief petitioned for, finding that the affidavits established probable cause to believe that the defendants were guilty of deliberate homicide.

Appellant levels two attacks against the amended information--one, that it fails to state an offense with the specificity required by the constitutional guarantee of due process of law, Amend. XIV, U.S. Const. and Art. II, Sec. 17, 1972 Mont. Const.; and two, that the affidavits filed by the State failed to establish probable cause to charge the defendants.

As previously noted, we have considered the sufficiency of the information in a special proceeding of Arthur Riley for writ of supervisory control and ruled that the charging language at issue here was sufficiently specific to satisfy due process requirements. This ruling makes the issue res judicata.

Section 46-11-401(1)(c), MCA, controls here and states the legal standards of specificity. It provides in pertinent part:

"(1) A charge shall:

". . .

"(c) charge the commission of an offense by:

". . .

"(iii) stating the facts constituting the offense in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended;

"(iv) stating the time and place of the offense as definitely as can be done; . . ."

The language must be "concise" but still sufficient to allow a "person of common understanding to know what is intended." This Court has held previously that an information charging a homicide is sufficient under this standard if it charges the offense in terms of a statute without reciting supporting evidentiary facts. See, State v. Coleman (1978), 177 Mont. 1, 22, 579 P.2d 732, 745, cert. denied, 446 U.S. 970 (1980).

In an earlier case, State v. Heaston (1939), 109 Mont. 303, 308, 97 P.2d 330, 332, this Court held that an information need not set forth the manner in which the death was caused, nor recite all possible legal theories the prosecutor wishes to pursue. See, State ex rel. McKenzie v. District Court (1974), 165 Mont. 54, 63, 525 P.2d 1211, 1216. The purpose of an information is to provide the defendant with notice, not to provide discovery of the State's evidence. See, McKenzie, supra.

We find the amended information is sufficient. It charged three theories of homicide: (1) that the defendant as a principal purposely or knowingly caused the death of James Gill by engaging in one or more of four enumerated kinds of conduct; (2) that the defendant aided and abetted in purposely or knowingly causing the death of James Gill by engaging in one or more of the four kinds of conduct; and (3) that the death of James Gill occurred while the defendant was engaged in or aiding and abetting in the commission of aggravated assault. Each theory was charged in the statutory language under section 45-5-102(1)(a) and (b), MCA. In addition, the defendant was notified that the State

intended to offer an accountability theory under section 45-2-302, MCA. The State abandoned the felony murder theory prior to trial. The information is intended to be a notice device, and this amended information served that purpose.

One of the attacks appellant makes on the information is that it fails to state the time and place of the offense "as definitely as can be done," since it charges that the various acts occurred in three different counties in this state over a period of about two years. We consider this allegation without merit. The law does not require that the time and place be stated with impossible precision; it merely requires that they be stated as definitely as possible under the circumstances of the case, unless time is a "material ingredient in the offense." See, State v. Heaston, 109 Mont. at 307, 97 P.2d at 332. Here the information alleges a continuing course of abusive conduct towards James Gill, beginning when his family joined the River of Life Tabernacle group and culminating with the boy's death on January 9, 1981. When such a continuing course of conduct is alleged, further specificity is not required. State v. House (1971), 260 Or. 138, 489 P.2d 381, 384.

Appellant relies most directly on State ex rel. Offerdahl v. District Court (1971), 156 Mont. 432, 481 P.2d 338, which is distinguishable from the case here. Offerdahl dealt with the sale of drugs by a relator to an informant, then identified only as "John Doe," occurring in Cascade County on a particular date. This Court held that the information did not sufficiently protect the relator from double jeopardy since it did not state sufficient facts to identify the transaction at issue. The Court ordered the

prosecutor to remedy this defect by filing an amended information which either identified John Doe, the informer, or stated other facts which sufficiently identified the transaction. Offerdahl did not hold that the details of evidentiary facts of the offense must be stated in every case. In fact, this Court has had numerous cases which hold otherwise. See, State v. Coleman, supra.

Appellant's next contention, that the amended information is defective because it fails to state the underlying facts of an aggravated assault which served as the basis for the felony murder theory, is incorrect for several reasons. First, no authority is cited for the proposition that such underlying evidentiary facts must be plead. Second, a person of ordinary intelligence would understand that the State intended to prove the aggravated assaults were against James Gill and resulted in his death.

Next appellant claims that the four affidavits filed in support of the charges did not establish probable cause to charge appellant with deliberate homicide. We find no merit to this argument. See, State v. McKenzie, supra, for principles governing the filing of an information.

In evaluating the various affidavits for probable cause, "magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense," and the reviewing court must give special deference to judicial probable cause determinations. See, State v. Troglia (1971), 157 Mont. 22, 26, 482 P.2d 143, 146, where this Court quoted from Spinelli v. United States (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. Here, the evidence from the affidavits considered by the District Court showed

-10-

that James Gill met his death as a result of a policy of persistent child abuse formulated by DeLorme and effectuated in large part by appellant. She encouraged the growth of the policy by counseling the church members to comply; she inflicted beatings remarkably similar to those which directly resulted in the death of James Gill on a variety of children of the commune, including James himself. While this conduct began in late 1979 when the church's disciplinary policy first arose, it continued when the church moved into Montana shortly before James Gill's death.

The affidavits showed that James Gill's death resulted from a continuing course of brutal abuse in which the appellant was both an instigator and an active participant. The evidence indicated appellant had previously beaten James to a point of unconsciousness and that because of the beatings and his sickle cell anemia, the child's condition was noticeably weakened by the time the group moved to Montana. Here the District Court, using its common sense and drawing permissible inferences, found probable cause to believe that appellant's intentional and knowing infliction, encouragement and instigation of such injuries caused or aided and abetted in the cause of James Gill's death. These affidavits provide more than sufficient support for the District Court's conclusion.

The next issue for consideration is whether there was sufficient evidence to support the jury verdict finding the appellant guilty of deliberate homicide. Appellant argues that under sections 45-2-301 and -302, MCA, for her to be guilty of deliberate homicide, there had to be evidence showing (1) that appellant did some act which either caused

-11-

or facilitated the victim's death, and (2) that she did that act purposely or knowingly. She argues that under State v. Jones (1963), 143 Mont. 155, 181, 387 P.2d 913, 926, this Court held: ". . . in every crime or public offense there must exist a union or joint operation of act and intent." Appellant argues that under Jones, therefore, for her to be liable for the death of James Gill it must be shown that her act of disciplining James Gill in July 1980 and again in September 1980 was done with the accompanying intent, knowledge or purpose that this discipline would cause his death. Appellant claims there was no evidence from which to draw any such inference.

Appellant argues that, in addition to the requirement that there must be some evidence showing a "conduct" on the part of the defendant to cause the death, under the provisions of section 45-2-201, MCA, there must be some "causal relationship" between the conduct and the resulting death.

We have previously set forth the facts supporting the filing of the information against appellant. In reviewing these facts to show a sufficiency of the evidence, we must note that the State did not attempt to prove that appellant struck the blow that ended James Gill's life. The State's case was tried on the theory that appellant was a major participant in a systematic series of acts which led to the death of James Gill, and, under this aspect of the case, it was appellant's conduct which was "a" cause of the death. Section 45-2-201, MCA.

All of the acts here related directly to the disciplinary program of the church, carried on under the direction of James DeLorme, the creator and leader of the church.

-12-

DeLorme spent much of the time during the last two years of James Gill's life on the road, and during those times appellant and her husband assumed the responsibility for child discipline.

Appellant was involved in church discipline throughout the time the church moved from Washington to Glasgow and Poplar. Along with her husband and DeLorme, appellant counseled the Gills and other church members about proper discipline of children. This discipline included punishment by beating with a fiberglass stick or electrical cord followed by a cold-water hose down. Appellant disciplined James Gill in this manner in his mother's presence for his refusal to eat; beat a one-year-old child who did not come back when called; and whipped Justelle Phillips DeLorme with an electrical cord in her mother's presence. Justelle testified at trial that the appellant did most of the whipping for the church and primarily was responsible for spanking James Gill in Glasgow. Appellant's involvement in the church's discipline policy continued to the very day of James Gill's death when she left Powers with the children, including James Gill, and told Powers he was in charge.

The evidence clearly established that appellant knew of the severe beatings inflicted on the children of the church members. She was aware that Justelle Phillips had at one time been beaten so severely that she was bruised from the waist down and passed blood in her urine. Appellant knew that James Gill suffered from sickle cell anemia and had beat him into unconsciousness on at least one prior occasion.

Appellant argues that by allowing the evidence of

"other crimes" the trial court failed to adhere to the decisions of this Court in State v. Just (1979), ___ Mont. ___, 602 P.2d 957, 36 St.Rep. 1649, and State v. Brubaker (1981), ___ Mont. ___, 625 P.2d 78, 38 St.Rep. 432.

This Court has identified several kinds of evidence which may be admitted despite the fact it tends to prove crimes other than those charged. See, State v. Meidinger (1972), 160 Mont. 310, 321, 502 P.2d 58, 65, wherein this Court allowed evidence of crimes committed in preparation for the charged offense as part of res gestae. In addition, in State v. Frates (1972), 160 Mont. 431, 437, 503 P.2d 47, 50, we allowed evidence of prior drug sales between the defendant and the police informant as "part of the corpus delecti of the crime . . . charged." In a series of recent cases, the Court held that evidence of crimes which is inextricably or inseparably linked with the crime charged may be admitted without regard to the rules governing "other crimes" evidence. State v. Trombley (1980), ___ Mont. ___, 620 P.2d 367, 37 St.Rep. 1871, and State v. Jackson (1979), 180 Mont. 195, 202, 589 P.2d 1009, 1014; see also, State v. Powers, supra.

The common thread tying these cases together is the fact that the State is entitled to present the entire corpus delecti of the charged offense including matters closely related to the offense and explanatory of it, even when such evidence discloses crimes other than those charged. The State's evidence in this case showed that the final beatings inflicted on James Gill differed from those previously inflicted by appellant and other church members only in the ultimate severity of the result.

We hold that the jury is entitled to view the death of James Gill in the context of prior events and that the beatings inflicted by the other people in the community were not isolated events but part of a continuous series of beatings inflicted by appellant and others over a period of months. To properly understand the events that took place before James Gill's death, the jury was entitled to consider all of these factors of child abuse prior to the boy's death.

As we noted in State v. Powers, supra, under these facts the State need not prove a specific intent to kill to prove deliberate homicide but need only show that the defendants engaged in a common design or course of conduct to accomplish an unlawful purpose (child abuse or assault). In Powers this Court also approved the State's contention that under Montana's accountability statute, where codefendants undertake a course of conduct or common scheme which results in a person's death, all can be held criminally responsible for a murder, citing People v. Spagnola (1970), 123 Ill.App.2d 171, 260 N.E.2d 20. See also, People v. Johnson (1966), 35 Ill.2d 624, 221 N.E.2d 662, and People v. Richardson (1965), 32 Ill.2d 472, 207 N.E.2d 478. We find that the facts here are sufficient under Spagnola and the cases above-cited to support the jury verdict.

The next issue raised is whether the court properly admitted two electrical cords as exhibits. The cords in question were State's Exhibits 8 and 9 and had been seized from appellant's mobile home on January 10, 1981, after Arthur Riley consented to the search. The State offered the cords through the testimony of Sgt. Ronald Wilson who seized

them during the search. The offer was objected to, and the State withdrew the offer pending further foundation during the testimony of Justin Phillips. Justin Phillips, one of the children, testified that when Powers was inflicting the final beating on James Gill, he told Justin to fetch an extension cord from the cupboard. After questioning Justin about the cord, the State offered it for admission with the foundation laid by Wilson who had obtained the cord during the search. The court then took the matter under advisement. Further argument about the cords took place when the State announced its intention to rest its case. They were finally admitted as exhibits in evidence.

Appellant argues that the cords were neither sufficiently identified as those cords used to beat James Gill nor connected with any conduct of the appellant. As we have previously held, the foundation for admission of exhibits is left to the discretion of the trial court. See, State v. Coleman, supra. Here, there was no abuse of that discretion. Sgt. Wilson established the chain of custody of the exhibits from the time of their seizure to the time they were admitted. Justin Phillips' testimony indicated that the cords were similar to those employed to beat James Gill on two occasions. The cords were relevant in light of Dr. Mueller's description of the marks on James Gill's body as inflicted with a looped object. They allowed the jury to compare the cords with the marks depicted in the photograph exhibits.

Finally, appellant argues that the exhibits were not tied to her conduct and therefore should have been excluded under our recent decision of State v. Casagranda (1981), ___ Mont. ___, 637 P.2d 826, 38 St.Rep. 2122. In that case, the

State introduced into evidence a pharmaceutical bottle which was never connected in any way to the charged burglary. Here, the cords were connected to the beatings inflicted on James Gill through the testimony of Justin Phillips. Casagranda is obviously distinguishable on the facts. We find the exhibits were properly admitted.

The next issue raised concerns whether the court properly admitted photographs of the victim's body into evidence. This issue was covered fully in State v. Powers, supra. We adopt the findings in that case, noting that the testimony of Dr. Mueller was virtually the same in the two cases. Dr. Mueller testified that the pictures accurately represented the victim's appearance at the autopsy and were reasonably necessary to depict the multiplicity and the extent of the injuries, how they were caused and their age. Here, the pictures taken at the autopsy definitely related to the charges against the appellant and were properly admitted. See, State v. Hoffman (1982), ___ Mont. ____, 639 P.2d 507, 39 St.Rep. 79.

The next issue raised by the appellant concerns whether the court properly instructed the jury in the language of the amended information. Instruction No. 16 stated:

> "You are instructed that the specific charge involving the defendants reads as follows:
>
> "'That during the period of November, 1979 to January 9, 1981 at Yakima County, Washington, Valley County and Roosevelt County, Montana the Defendants committed the offense of Deliberate Homicide, a felony, in that the Defendants did purposely or knowingly cause or aided or abetted in purposely or knowingly causing the death of James Gill, a human being, by instigating, inciting, promoting, encouraging or commanding the physical abuse or mistreatment of James Gill, and/or by

lending their support, assent, countenance or
approval to the continued or repeated mis-
treatment of James Gill, and/or by failing or
refusing to intervene or oppose the mistreat-
ment of James Gill, and/or by failing or
refusing to secure medical or hygenic care
for James Gill necessary for his physical
well-being in violation of sections 45-5-
102(1)(a) and 45-2-302(3), MCA and contrary
to the form, force, and effect of the
statutes in such case made and provided and
against the peace and dignity of the State of
Montana.'

"To this charge the defendants have pled not
guilty and under their pleas, they deny every
material allegation of the Amended Informa-
tion against them, and in order to convict
them of the crime charged against them every
material fact necessary to constitute such
crime must be proved by the State by
competent evidence, beyond a reasonable
doubt. If the jury entertains any reasonable
doubt upon any fact or element necessary to
constitute the crime charged, it is your duty
to give the defendants the benefit of such
doubt and acquit." (Emphasis added.)

To this proposed instruction counsel for appellant
objected on the following basis:

"Your Honor, I took my instruction basically
from -- and the only objection that I have is
that if you put the information in, that it
would contain extra wordage which might
confuse the jury on the actual elements of
the offense, it has such things as maltreat-
ment and so forth and there is not going to
be an instruction on negligent homicide, so I
think this is confusing to the jury."

Appellant's objection to the instruction must be
considered in light of our previous discussion of the first
issue. In McKenzie, supra, we noted that the purpose of the
information is to provide the defendant with notice, not to
provide discovery of all the State's evidence. Appellant
previously had filed motions to dismiss the original infor-
mation and two amended informations. As a result of his
objections, the State amended to provide the necessary
information contained in Instruction No. 16. We have in our

discussion of the first issue upheld the sufficiency of that information and find no necessity of changing that decision under this second attack on that issue.

This Court has previously established the standard for instructions that a single instruction must not be viewed in artificial isolation but must be viewed in the context of the overall charge. If all instructions, reviewed as a whole, fairly and accurately present the case to the jury, the fact that one instruction, standing alone, is not as full as it might have been is not reversible error. State v. Coleman, supra; State v. Azure (1979), 181 Mont. 47, 591 P.2d 1125; State v. Farnes (1976), 171 Mont. 368, 558 P.2d 472.

The instruction is a proper instruction in a deliberate homicide case, and its only difference from the instruction offered in the previous defendants' case is that the words of the information were inserted into it. The instruction explains in detail the State's theory of the charge and when read with the other instructions given by the court, Instruction Nos. 30, 31, 32, 33, 34, 35, 36, 37, and 38, along with Instruction No. 13, it is our opinion that the instruction was properly granted.

The last issue for consideration is whether the verdict is supported by sufficient evidence. As previously set forth, there is ample evidence to support the verdict in this case which would allow the jury to find appellant guilty beyond a reasonable doubt. As we previously noted in State v. Fitzpatrick (1973), 163 Mont. 220, 227, 516 P.2d 605, 610, evidence must be given "all the legal effect toward guilt which it could support," and conflicts in the

evidence on appeal must be resolved in favor of the State. See, State v. Pascgo (1977), 173 Mont. 121, 566 P.2d 802. When the evidence is analyzed in light of the rules set forth in the above cases, it is more than sufficient to support the State's theory of the case.

Finding no reversible error we affirm the conviction.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-20-

Mr. Justice John C. Sheehy, dissenting:

I would reverse the conviction of Sherry Riley.

In my opinion the connection of Sherry Riley to the beating death of James Gill is far too attenuated to make her accountable with the principals in this case.

This is a bizarre case of guilt by association. She has been convicted as accountable not because she acted to whip or beat James Gill, or stood by while he was being beaten, but because she adhered to a belief in the strong discipline of children as a religious tenet. Acting under that tenet, she had previously administered some strong discipline herself, to James Gill and to others, but she never beat anyone to the point of death. It cannot be said under the evidence here that she "purposely or knowingly" acted to bring about the death of James Gill, or that she purposely promoted or facilitated the commission of deliberate homicide.

Additionally, I think that she is at the least entitled to a new trial because instruction no. 16 is fatally flawed in permitting the jury to convict Sherry Riley for nonstatutory reasons. In effect, the court and the jury made up their own crime of accountability.

A person is accountable under section 45-2-302(3), MCA, only when, "either before or during the commission of an offense with the purpose to promote or facilitate such commission," the person aids or abets the principal actor in the planning or commission of the offense. The court correctly instructed the jury on this point in instruction no. 30.

Instruction no. 16 conflicts with instruction no. 30 because no. 16 adds additional but nonstatutory grounds upon which to convict of accountability. By breaking instruction

-21-

no. 16 into some of its components, one can see language that had no place in an instruction to the jury:

> ". . . The defendants did purposely or knowingly cause or aided or abetted in purposely or knowingly causing the death of James Gill by

> "[1] '. . . lending their support . . . countenance or approval to the continued or repeated mistreatment of James Gill;

> "[2] '. . . failing or refusing to intervene or oppose the mistreatment of James Gill;

> "[3] '. . . failing or refusing to secure medical or hygenic care for James Gill;

> "[4] '. . . in violation of sections 45-2-201(1), (a), and 45-2-302(3), MCA . . ."

The language contained in [1], [2], and [3], is not to be found in any statute defining a crime either of accountability or deliberate homicide in Montana. Yet, that bracketed language is, by the statement in [4] held out to the jury as being a violation of certain sections of the Montana Code. On that basis, the instruction is misleading, confusing and in conflict with the other instructions given by the court which define the offense of accountability in statutory language.

It was of course improper in this case for the court to include the language of the information in an instruction to the jury. We have approved in earlier cases the inclusion of the language from an information in a jury instruction, particularly in State v. McKenzie (1980), ___ Mont. ___, 608 P.2d 428, 444, 37 St.Rep. 325, 339, where we said:

> "Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury. There was no error in incorporating the entire Information into the preliminary instructions, for it too is basically in statutory language merely inserting defendant's name and the victim's name in the proper

-22-

<u>places</u> and enumerating the weapons used
. . ." (Emphasis added.)

It is one thing to incorporate the <u>statutory</u> language in an instruction from an information and quite another to include in an instruction <u>nonstatutory</u> language from an information. For all we know, the jury convicted Sherry Riley of "failing or refusing to secure medical care" for James Gill or "failing or refusing to intervene or oppose in the mistreatment of James Gill," for neither or which is there a statutory duty placed upon Sherry Riley. To that extent instruction no. 16 invents a crime not set out in our criminal code.

I therefore dissent.

_____
                Justice

Mr. Justice Daniel J. Shea dissenting:

I join with Mr. Justice Sheehy in his dissent.

_____
                Justice