People of the State of Illinois, Plaintiff-Appellee, v. Phillip Spagnola (Impleaded), and John Ligue (Impleaded), Defendants-Appellants.

Gen. Nos. 51,681, 51,682, 51,683, 51,684, 51,686, 51,687, 51,688, 51,689. (Consolidated.)

First District, Second Division.

April 7, 1970.

171

173

Robert J. Waaler, of Urbana, for appellants.

No brief for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

In a two-count indictment, the defendants, Phillip Spagnola and John Ligue, ages 18 and 21 respectively, and two other youths, William McAvoy and Kenneth Cunningham, were jointly charged with murder in violation of Ill Rev Stats (1963), c 38, § 9–1(a)(1) or (a)(2). McAvoy's motion for a severance was granted and he received a separate trial. He did not testify in the instant case and this record is silent as to the ultimate disposition of his case. The other three coindictees, Spagnola, Ligue and Cunningham, were jointly tried by a jury, were convicted of murder and judgments were entered. In a separate opinion filed today, we affirmed Cunningham's conviction. See People v. Cunningham, 123 Ill App2d 190, — NE2d —. After judgments were entered against Spagnola and Ligue for murder and their oral post-trial motions for a new trial and in arrest of judgment were denied, Spagnola was sentenced to fifteen to thirty years in the State Penitentiary and Ligue received a twenty to forty-year sentence.

At the time of sentencing, one joint indictment was pending against Spagnola and Ligue for armed robbery and two two-count indictments for attempt murder and aggravated battery—the latter two indictments arising out of the same criminal transaction as the murder but having two other victims. After being sentenced on the murder charge, both Spagnola and Ligue waived their right to a jury trial as to these other three indict-

174

ments. The court heard stipulated testimony and entered six judgments finding each defendant guilty of armed robbery and attempt murder. Spagnola was sentenced to two to seven years for armed robbery and two to five years on each conviction of attempt murder, the sentences to run concurrently with the imprisonment earlier imposed for murder. Ligue received concurrent sentences of five to ten years for armed robbery and three to five years on each conviction of attempt murder. Although Spagnola filed a notice of appeal challenging his convictions for armed robbery and attempt murder, the instant brief in behalf of Spagnola and Ligue concerns itself only with their convictions for murder and Ligue's convictions for armed robbery and attempt murder. No point is raised in this brief concerning Spagnola's convictions for armed robbery and attempt murder although all eight appeals were consolidated in this court. These three judgments, affecting Spagnola only, are accordingly affirmed.

Turning to the contentions raised by the parties in their joint brief, Ligue alone urges that all four of his convictions (i. e. murder, armed robbery and attempt murders) should be reversed because the trial court erred in not granting his written motion for discharge based upon the State's alleged failure to try him within 120 days following his arrest. Regarding their murder convictions, Spagnola and Ligue raise four points on appeal: (1) the court erred in denying their motion challenging the array of prospective jurors; (2) they were not criminally responsible for the spontaneous act of their companion, Cunningham, which caused death, in that the prosecution failed to show a common design to do an unlawful act, nor that they participated in the assault causing the victim's death; (3) the court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter; and (4) improper

175

conduct by the decedent's widow before the jury together with the introduction, over objection, of incompetent evidence by the prosecutor and his prejudicial rebuttal final argument deprived them of a fair trial.

As to the speedy trial contention urged by Ligue, we note that he was arrested in February, 1965, was never admitted to bail, and his jury trial began in January, 1966. In the interim, the public defender was appointed to represent him beginning with his arraignment in March, 1965. The defendant voiced no objection to this representation until August 16, 1965, when the common-law record indicates that he appeared in court and moved that the Public Defender be replaced by a Chicago Bar Association lawyer. The common-law record also reveals that this motion was denied, after argument, and the cause was continued to August 27, 1965, by "the express consent of the State's Attorney and the defendant and his counsel." The common-law record also shows that on September 17, 1965, the defendant renewed his request for a Chicago Bar Association lawyer and the court, again with "the express consent and agreement of the State's Attorney and the defendant and his counsel," continued the case to October 11, 1965, for the appointment of such counsel. On this latter date the public defender was granted leave to withdraw and a private attorney was appointed. When Ligue's case was reached for trial on January 24, 1966, he filed his motion to dismiss the four indictments pending against him on the grounds that his right to a speedy trial had been violated. He urged that the 120 days be counted from September 17, 1965, when he had renewed his motion for substitution of attorneys.

■ On the basis of this record, we hold that the defendant Ligue agreed to these continuances so that the 120-day rule found in Ill Rev Stats (1963), c 38, § 103–5 (a) began to run from the date to which the case was

176

continued for the appointment of new counsel which would be October 11, 1965, in the instant case. People v. Kuczynski, 33 Ill2d 412, 415, 211 NE2d 687, 689 (1965); People v. Barksdale, 110 Ill App2d 163, 166, 249 NE2d 165, 167 (1969). Although the record contains no apparent reason for the trial court's change of attitude after Ligue renewed his motion for substitution of counsel, the record is clear that Ligue sought this substitution and consented to the continuance to October 11, 1965. Since the defendant was tried within 120 days from October 11, 1965, the trial court properly denied his motion for discharge.

On January 24, 1966, prior to the commencement of the voir dire examination in the murder case involving Spagnola, Ligue and Cunningham as joint defendants, the attorney for Cunningham presented to the court a written "Challenge to the Array of Jurors and Motion for (30) Day Continuance" which was signed by the defendant Cunningham, supported by his affidavit, and had attached to it as exhibits, three newspaper articles which had appeared in the Chicago press. The Challenge alleged that on the preceding Monday, January 17, 1966, a judge sitting in the Cook County Criminal Court Building (not the trial judge sitting in the instant case however) had publicly criticized, discharged and dismissed from future jury service twelve jurors who had returned a not guilty verdict. The Challenge went on to state that these twelve jurors were part of the same venire from which the defendants' jury would be selected; that the jurors were discharged because the judge thought a conviction should have been returned and not an acquittal; that these jurors returned to the Criminal Court Building the next morning but were sent home; that these facts had been given publicity by the Chicago newspapers on Wednesday and Thursday, January 18 and 19, 1966; and that as a result of the foregoing fac-

177

tors, a fair and impartial jury could not be selected from this venire. The Challenge concluded with a prayer that the trial be continued for thirty days so that the defendants could select a jury from a new venire. After hearing argument, the court denied the Challenge to the Array and Motion for a Continuance but informed the three defense counsel that each would be permitted the widest of latitude in the ensuing voir dire examination so that each could determine to his satisfaction whether the veniremen knew of this incident and the extent, if any, to which they were influenced by it. The trial court later refused to excuse such prospective jurors for cause requiring the defendants to use their peremptory challenges. The record reveals that the defendants and the State were each allowed a total of sixty (60) peremptory challenges.

In their joint brief before us, Spagnola and Ligue contend that the trial court erred in denying the Challenge to the Array because the reasonable effect of the facts as pleaded in the Challenge, was to leave an impression in the minds of the veniremen that they would be called upon to explain or defend a not guilty verdict and that they could be publicly rebuked by the trial judge for such a verdict and thereby subject to public ridicule. We are of the opinion that the trial judge handled this difficult and delicate matter in a reasonable manner and with the proper exercise of his discretion. Within this factual setting, the proper remedy was to expand the voir dire examination and not to impose a thirty day continuance. It does not follow that the other veniremen would be per se prejudiced against defendants or that they could not return a fair verdict.

The voir dire examination is included in the record before us. The examination of prospective jurors took approximately three days and the trial of the case on the ultimate issues took a like period of time. During the voir dire examination, the trial court informed the

178

prospective jurors on four separate occasions that it had the practice, which it intended to continue, of never commenting on the verdict of the jury. Approximately ninety prospective jurors were examined and the majority of those who were asked the question stated that they had read, in the jury assembly room, the newspaper articles earlier alluded to, but most of them said they were not influenced by it and would continue to follow the dictates of their own conscience. The defendants used their peremptory challenges on those veniremen having a contrary attitude. When twelve jurors were acceptable to both sides and were sworn, the court had excused nineteen prospective jurors for cause and the State had used thirteen of its peremptory challenges whereas the defense had used forty-one. Although the defendants contend that the court erred in refusing their request to challenge for cause all jurors who had read the newspaper articles, they were not prejudiced by this ruling since they had nineteen peremptory challenges remaining at the time the jury was accepted and sworn.

▪ Although many of the prospective jurors stated during voir dire that they had read the newspaper articles in question and a few said they had heard other jurors talking about the articles in the jury assembly room, this alone is not decisive as it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Irvin v. Dowd, 366 US 717, 723 (1961) ; People v. Williams, 40 Ill2d 522, 531–32, 240 NE2d 645 (1968). Furthermore, the examination of prospective jurors is, in a typical instance of pretrial publicity, probably the most valuable means of ascertaining partiality or indifference among the veniremen. People v. Kurtz, 37 Ill2d 103, 108, 224 NE2d 817 (1967). We have carefully examined the seven hundred and twenty-two page transcript of the voir dire examination presented to us and note that all

of the prospective jurors who ultimately made up the final panel of twelve and who were asked the question, stated that what another judge did in an unrelated case and the newspaper publicity given it would not affect their deliberations in the instant case and that it would not be necessary to convict these defendants in order to avoid criticism from the judge presiding at this trial. Some of the twelve jurors acceptable to both sides, including the later foreman of the jury, stated that they thought the other judge was incorrect in criticizing the other jury for doing their duty. The judge presiding at the instant case informed the prospective jurors on four separate occasions that he intended to continue his practice of never commenting on the verdict returned by the jury.

■ It is also to be noted that when the jury was sworn, the defendants had nineteen unused peremptory challenges. This too indicates that the lawyers for the defendants were of the opinion that these twelve jurors represented a fair and impartial trier of the facts. People v. Sleezer, 9 Ill2d 57, 60–61, 136 NE2d 808 (1956); People v. Williams, 40 Ill2d 522, 531–2, 240 NE2d 645 (1968); People v. Speck, 41 Ill2d 177, 184, 242 NE2d 208 (1968). In our opinion, the defendants were tried by a fair and impartial jury.

Since the defendants contend that they are not criminally responsible for the spontaneous act of their companion, Cunningham, which caused death in that the prosecution failed to show a common design to do an unlawful act, nor their participation in the murderous assault, it becomes necessary to give a summary of the evidence.

This case involves a homicide which occurred in a Chicago tavern at approximately 12:15 a. m. on February 20, 1965. It was stipulated that the cause of death of the victim, Jack Naylor, a patron in the tavern, was internal bleeding. Eight other patrons in the tavern testified for

the State. Three of them, James Norred, Robert Naylor, brother of the decedent, and Ruby Brookbank were eyewitnesses to the homicide and stated that Cunningham while holding the smaller, narrower end of a pool cue stick in both hands and swinging the pool cue like a baseball bat, struck the deceased a downward blow on the left side of his head. The decedent was unarmed and was sitting at the bar when he was struck. It is undisputed that the defendants, Ligue and Spagnola, were present in the tavern at this time. Disputed at the trial, however, was whether they had their guns drawn immediately upon entering the tavern, thereby subduing the patrons prior to Cunningham's act, or whether they drew their weapons after a purported melee occurred in the tavern.

James Norred testified that he was in the bar at 11:30 p. m. on February 19, 1965, when Cunningham, Spagnola, Ligue, Ligue's father, and another youth came in; that he began a conversation with Ligue since they knew each other and it was during this conversation that he heard the bartender, Bennie Micele, while walking away from Ligue, Sr., say the bar was closed and he was not going to serve him. Thereupon the defendant, Ligue, Jr., pointing at the bartender, uttered a profanity and said he was going to get him. Norred also saw a fight beginning at this time between another patron and the defendant Cunningham, but this was stopped at its inception. Cunningham, Spagnola, the Ligues, and the other youth then left the tavern. Norred said he spoke with defendant Ligue in a car before they left and there Ligue repeated his threat to get the bartender and said: "We're coming back and going to clean the place up, stay on the side."

About 12:15 a. m., Cunningham, Ligue, Spagnola, and the other youth returned. Spagnola and Ligue entered first with drawn weapons and one of the four told the patrons to get on the floor. Cunningham came to the

181

rear of the tavern and told Norred to get against the wall so he would not get hurt. Norred saw the bartender, Micele, lying under the pool table and the fourth youth was swinging a cue stick in the middle of the tavern while Ligue and Spagnola, at the front of the tavern, continued to hold their drawn weapons and the other patrons got on the floor. After Cunningham struck the decedent, Jack Naylor, Norred saw him hit Bob Naylor and Robert Hill. Spagnola was then looking throughout the tavern for the bartender and upon finding him, Norred stated that Cunningham hit Micele with a cue stick and Spagnola and Ligue kicked and punched him and later all three of them threw pool balls at Micele's head. The telephone then rang and the four youths started to leave. As Norred went to the phone, he saw the fourth youth hit another patron on the head because he had raised it and Ligue said to Norred: "Don't answer that phone or I'll shoot you too." When they left, Norred answered the telephone but no one was on the line. The police arrived soon thereafter. In conclusion, Norred said he was not hurt in the encounter; none of the patrons were armed nor attempted to strike any of the youths; when he went to look at the decedent after the youths had left, he was unable to hear a heart or pulse beat; and he identified two weapons produced by the State as being in the possession of Spagnola and Ligue at the time of the affray.

On cross-examination, he admitted that when he testified at the Coroner's Inquest approximately one week after the homicide, he did not state there that he had talked with Ligue in a car where Ligue repeated his threat to get the bartender but he had stated at the inquest that only Cunningham hit the bartender, Micele, with a pool cue, kicked him, and threw pool balls at his head.

The other tavern patrons who testified for the State substantially corroborated Norred's testimony except

that many of them put their heads down when ordered to do so and were not able to see which of the defendants did the striking. Most of them stated that when the bartender refused to serve Ligue's father, the group said they would be back and they did return approximately thirty minutes later with two weapons. Those asked the question stated there was no argument in the bar with the defendants when they returned but rather the patrons complied with their orders. The bartender, Micele, said he refused to serve them at 11:30 p. m. because they looked under age and had been drinking. He did not see who hit him later and with what he was struck or kicked because his eye was puffed up as a result of the attack and he received eight stitches in his head. Some of the other patrons who testified for the State stated that in leaving the premises, someone in the group said, "We should shoot them all" and another replied, "No, we have done enough damage."

Two police officers testified for the State. Patrolman Joseph Curtin said he investigated the homicide and beatings at the tavern and returned to the police station when he saw Cunningham and another youth brought in between 4:00–4:15 a. m. on February 20, 1965. He went on to say that based upon his observation of Cunningham he might have been drinking a little but he could not say he was intoxicated. A homicide detective, Leo Wilkosz, testified that on February 22, 1965, at 11:30 p. m. he went to a cottage in LaPorte, Indiana, and there found Spagnola and Ligue apparently alone in the cottage. They were arrested and two loaded guns were found under the mattresses of the bed. These were the weapons recognized earlier by Norred as being in the possession of Spagnola and Ligue in the tavern. Spagnola and Ligue waived extradition and were returned to Illinois.

Three witnesses testified for the defense: Mrs. Ligue, Mrs. Cunningham, and Phillip Spagnola, one of the de-

fendants. Mrs. Ligue stated that she did not see her son after 10 or 11:00 a. m. on February 19, 1965; that he was living at home with her and her husband; and that he was arrested in Indiana at the home of his aunt and uncle, where he frequently visited and to which home he had his own key. Mrs. Cunningham testified that her son lived at home with her; that she ate supper with him at 5:00 p. m. on February 19, 1965; and that when she returned from work that evening at 11:00 p. m., she saw her son again. At that time he was staggering, glassy-eyed and intoxicated but would not go to bed as she wanted. He left the house and she did not see him again until 8:15 a. m. on February 20, 1965 at the police station. In her opinion, when she saw her son at 11:00 p. m., he did not have the ability to think and reason because he was intoxicated.

Phillip Spagnola testified that on February 19, 1965, he drank beer with his friend Ligue from 11:00 a. m. to 11:00 p. m.; that Cunningham and another youth appeared at 6:30 p. m. with a bottle of whiskey and more beer which they drank together; that by 11:00 p. m. he, Spagnola, was drunk when Ligue's father arrived and they went in a car to Cunningham's house and then to the bar; that at this time Ligue was also drunk and Cunningham was very drunk. An argument did occur at the bar when they were there the first time but he and Ligue were able to get Cunningham, Ligue's father and the other youth to leave with them. He could not remember if anyone in the group made any threats to clean up the place or vow to return. After taking Ligue's father home, the four of them stopped at the home of Ligue's aunt, where Ligue went in alone and procured two weapons, an automatic and a revolver. They went back to the tavern because someone in the group suggested they return to see what the earlier argument was all about. Spagnola stated that he had no reason for taking the

184

weapon given to him by Ligue; that they said nothing to each other when he accepted the weapon; and that he had no intent to return to the tavern "to clean it up." The four had no such agreement and they were intoxicated when they appeared again at the tavern. He denied that they entered with drawn weapons but stated that he heard some patron yell "They're back" and "Watch it" whereupon he saw someone swing a pool cue striking Cunningham across the back or shoulders and then a "big fight" began, causing Ligue and himself to draw their weapons and keep the patrons at the bar from striking them, as they had pool cues in their hands. At this time he and Ligue were at the front of the tavern from which place they never left, whereas Cunningham and the other youth were at the back of the tavern. He denied ever looking for the bartender, Micele, and denied ever beating, kicking, striking, or throwing pool balls at him. He never saw what Cunningham did in the tavern and he did not hear anyone in his group say "Let's shoot them all" or "We've done enough damage." They all went out the door together and left in their car. On February 21, 1965, he and Ligue went to Indiana, as Ligue had a key to the home there.

 We are of the opinion that the State's evidence, if believed by the jury, did show a common design among the defendants herein and Cunningham to do an unlawful act. While mere presence at the scene of the offense is not enough to constitute a person a principal, circumstances may show there is a common design to do an unlawful act to which all assent. People v. Thicksten, 14 Ill2d 132, 150 NE2d 813 (1958). The circumstances in this case presented by the State from which the jury could reasonably find a common design to do an unlawful act are: the prior argument in the tavern with the bartender and the group's threat to return; their

185

actual return within a half-hour but not before they had armed themselves with two guns in an apparent attempt and intent to subdue the patrons in the tavern who outnumbered them; the fact that Spagnola and Ligue entered first with drawn weapons which induced the patrons to submit to their commands, and that they kept these weapons on the patrons throughout the affray. Furthermore, none of the defendants attempted to stop Cunningham from his assaults or opposed him in any way and they all fled together but not before Ligue told Norred not to answer the telephone. These facts support a reasonable inference that the unlawful use of force having possible dangerous consequences was agreed upon by all the members of the group so that Spagnola and Ligue are criminally responsible for the acts of Cunningham. People v. Rybka, 16 Ill2d 394, 404-5, 158 NE2d 17 (1959) ; People v. Tarver, 381 Ill 411, 415-16, 45 NE2d 630 (1943). The jury was instructed on criminal accountability or responsibility in the language of the statute, Ill Rev Stats (1965), c 38, § 5-2(c). We hold that the State's evidence amply supported the giving of such an instruction.

The defendants also urge that the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter. This contention is based upon the assertion that when Cunningham struck the decedent with a pool cue, he did so without any knowledge that such an act would result in death. We do not agree with this reasoning. Criminal recklessness is the intent required to reduce the degree of homicide from murder to the lesser included offense of involuntary manslaughter. See Ill Rev Stats (1965), c 38, § 9-3(a). If the act is performed with malice, either express or implied, the offense is not involuntary manslaughter, but is murder. People v. Marrow, 403 Ill 69,

73–74, 85 NE2d 34 (1949). In the case at bar, the intent or state of mind which Cunningham possessed when he struck Jack Naylor is shown by the surrounding circumstances. It is undisputed that Cunningham deliberately struck the deceased in the head with the fat end of a pool cue which he was swinging like a baseball bat and which apparently caused instantaneous death. The act was done without provocation as the deceased was unarmed and was sitting at the bar. The evidence amply supports a finding, beyond a reasonable doubt, that the act was not done recklessly, but rather was performed with implied malice. The intent to take human life may be inferred from the character of the assault. People v. Coolidge, 26 Ill2d 533, 536–37, 187 NE2d 694 (1963). The manner in which the pool cue was used in this case made it a deadly weapon. People v. Dwyer, 324 Ill 363, 155 NE 316 (1927). Since the evidence would not support a verdict of involuntary manslaughter, the court did not err in refusing to give the involuntary manslaughter instruction tendered by the defendants.

Finally, the defendants contend that errors occurring during the trial deprived them of a fair trial. During direct examination of the State's first witness, Mrs. Smeltz, the decedent's mother, and after she had testified that she last saw her son being carried out of Mercy Hospital on a stretcher, an incident occurred before the jury. The decedent's widow, who had been sitting in the courtroom, rose, faced the jury, and cried out: "Please, please. No, no, no, no." With both hands extended over her head and screaming, she then ran to the rear of the courtroom and out into the corridor, where her cries were heard for almost a minute. The jury was excused, whereupon the court learned that this woman was the widow of the deceased. The court then barred her from the building and denied the defendants' mo-

tion for a mistrial. When the jury returned, the court immediately instructed them to totally disregard the incident. This admonition was repeated by the court the next day and, at the end of the trial, a written instruction was given to the jury which stated: "The court instructs the jury that they are to disregard any show of emotion or demonstration made in the courtroom." The defendants allege that the very nature of this emotional incident deprived them of a fair trial before a dispassionate jury and that the court erred in not declaring a mistrial.

██ It is our opinion that the trial court's prompt actions in immediately admonishing the jury to disregard this spontaneous emotional demonstration coupled with its giving of the later cautionary jury instruction alleviated the effects of this outburst on the jury and insured that the defendants were tried by an impartial jury. People v. Herbert, 361 Ill 64, 71–72, 196 NE 821 (1935); People v. Lion, 10 Ill2d 208, 216, 139 NE2d 757 (1957). It should also be noted that this jury was selected for its independence in judgment. The extensive voir dire examination emphasized this point. Based upon this factor and the trial court's affirmative reaction to this spontaneous occurrence, we hold that the denial of the mistrial was proper.

██ ██ The State presented evidence of the defendants' arrest in Indiana two days after the homicide. The defendants objected to the introduction of such evidence on the grounds that there was no showing of flight and hence such evidence was prejudicial. In this appeal the defendants contend that such evidence was incompetent because there was no showing by the State that they went to Indiana with a consciousness of guilt, as they allegedly had no knowledge that a homicide had occurred in the tavern. Alternatively, it is urged that their trip to Indiana could have been motivated by their involvement in an armed robbery which occurred several

days prior to the homicide, so that evidence of their arrest in Indiana was incompetent at their trial for murder. We find no merit in either contention. Although the armed robbery occurred prior to the homicide, the defendants did not leave Illinois until after the homicide; therefore, if they did flee the jurisdiction with a consciousness of guilt concerning the homicide, such flight would be competent at their trial for murder as circumstantial evidence of their guilt. We are of the opinion that the evidence presented at the murder trial presented sufficient facts from which a reasonable inference could be drawn that the defendants did flee the jurisdiction with a consciousness of guilt of the homicide. Spagnola and Ligue along with Cunningham and another youth all returned to the tavern within one-half hour after the preceding argument and after vowing to do so. If the jury believed the State's evidence, Spagnola and Ligue had weapons drawn when they returned and kept the patrons subdued while Cunningham struck the deceased. There was evidence that Spagnola and Ligue participated in the beating of Micele, the bartender, and that all four youths left the tavern together when the telephone rang, leaving the scene in the same auto. Such evidence supports an inference that the youths were acting in concert in the tavern and thereafter fled the scene and later Spagnola and Ligue fled the jurisdiction with a consciousness of guilt. The evidence of their arrest in Indiana was competent and the court was also correct in giving a flight instruction to the jury.

 At the close of the prosecutor's rebuttal final argument, the defendants made a motion for mistrial which was denied. This motion was premised on the grounds that the final argument of the State in rebuttal was too lengthy, introduced prejudicial matter and exceeded the bounds of legitimate reply. The defendants renew these contentions on appeal. We have carefully reviewed the prosecutor's closing argument in re-

buttal and have found no error therein. Its length appears to have been necessitated by the fact that each of the three defendants had his own counsel, so that the prosecutor, in rebuttal, had to reply to three closing arguments by the defense. The rebuttal argument did not introduce new matters to which the defense could not respond before the jury, but was merely a reply to the final arguments of the three defense counsels. When the prosecutor attempted to comment on a statement of its witness which was not in evidence, the court immediately sustained the objection of defense counsel and informed the jury to disregard it. The rebuttal closing argument was proper here.

 We have carefully reviewed the record in this case and are of the opinion that the defendants received a fair trial and their guilt of murder was proved beyond a reasonable doubt. The judgments are affirmed.

Judgments affirmed.

McCORMICK, P. J. and BURKE, J., concur.