No. 81-359

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

DANIEL EMMETT POWERS, ROBERT STEELE
POOLE, GRADY GILL and JENNIFER DENISE GILL,

Defendants and Appellants.

---

Appeal from:   District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellants:

Cresap and Phillips, Sidney, Montana
Richard Phillips argued, Sidney, Montana
Gallagher, Archambeault and Knierim, Glasgow, Montana
Matthew Knierim argued, Glasgow, Montana
Francis J. McCarvel argued, Glasgow, Montana
Ralph J. Patch argued, Wolf Point, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Chris Tweeten argued, Assistant Attorney General, Helena,
Montana
Marc F. Racicot, County Prosecutors Service Bureau,
Helena, Montana
James A. McCann, County Attorney, Wolf Point, Montana

---

Submitted:   March 29, 1982

Decided:   June 7, 1982

Filed: JUN 7 - 1982

_Thomas J. Kearney_
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Each of the four defendants was convicted of deliberate homicide in the death of five year old James Gill following a jury trial. Each defendant appeals from the judgment of conviction and denial of a new trial. We affirm all convictions.

The evidence showed that all four defendants were members of the River of Life Tabernacle Church at Poplar, Montana, and that James Gill was the son of defendants Jennifer Gill and Grady Gill. Adult members of this organization took turns being responsible for and supervising the children of the other members.

On Thursday, January 8, 1981, defendant Poole was taking care of the children, including James Gill, at the trailerhouse of Art Riley, another church member. At lunch James refused to eat a baloney sandwich and vomited. Poole took James into the back bedroom and spanked him with a fiberglass stick an undetermined number of times. Poole also put James in the shower.

The next morning the children were taken to the trailer where defendants Grady and Jennifer Gill lived. They were fed breakfast but James refused to eat. Grady Gill told him that if he didn't eat he would get a spanking. James still wouldn't eat so Grady Gill struck him on the legs with his belt and, as James ran past Gill into the bedroom, he struck him again on the buttocks. Grady Gill and Jennifer Gill then pulled James out from under the bed and Grady Gill struck him four more times, twice of which were with the belt. He also placed James in the shower.

On the evening of that day (January 9), the children returned to the Riley trailer and were fed supper. James refused to eat the baloney sandwich he had been given the night before and defendant Powers, who was in charge of the

children, struck James numerous times with the fiberglass stick and an electrical cord. He also placed him in a cold shower a couple of times.

At approximately 12:30 a.m. the next morning (January 10, 1981), Art Riley took James to the emergency room at the Poplar Hospital and James was pronounced dead a few minutes later. After the Roosevelt County undersheriff and the county attorney were informed of the matter, the undersheriff went to Riley's trailer at about 3:30 that morning. Defendant Poole answered the door and voluntarily discussed the matter with the undersheriff. Poole described James as a rebellious child and stated that although all children were evil on the inside, the church was developing a more perfect child through chastisement.

Subsequently, the county attorney filed an amended information charging defendants with deliberate homicide and purposely or knowingly causing, or in aiding or abetting, James' death. Prior to trial, Powers moved for the appointment of an investigator, which was denied.

At trial the prosecuting attorney informed the court that he would not seek the death penalty and the court, over all defendants' objections, ruled that each defendant would be limited to six peremptory challenges to the prospective jurors and one for the alternative juror. Dr. Mueller, who performed the autopsy, testified there were about 150 bruises on the victim's body, 75 percent of which had been inflicted within 48 hours prior to death. The doctor referred to various color photographs taken during the autopsy, which were admitted into evidence. Also at trial, the undersheriff testified as to his conversation with Poole (Poole did not testify) and the court admitted testimony of prior acts against the victim and other children by members of the church other than defendants.

-3-

The jury found all four defendants guilty of deliberate homicide. Powers was sentenced to 60 years in the State Prison, Grady Gill to 20 years with 12 years suspended, Poole to 10 years with 4 years suspended, and Jennifer Gill received a 20 years suspended sentence.

The following specifications of error are raised on appeal:

1. Error in admitting color photographs in evidence.

2. Error in limiting defendants to six peremptory challenges of prospective jurors and one for the alternate juror.

3. Error in denying Powers' motion for an investigator.

4. Failure of the State to prove beyond a reasonable doubt that defendants "purposely or knowingly" caused the death of James Gill.

5. Error in admitting testimony of prior acts of violence committed by persons not defendants against the victim or other children.

6. Denial of defendants' right of confrontation by allowing the undersheriff to testify regarding Poole's statements to him.

Initially, we find the trial court properly admitted the color photographs of James Gill's body. State's exhibits 16, 24 and 25 were admitted without objection. Defendants did not object to State's exhibits 1 thru 5 except to request the court to postpone a ruling until the other photos had been received so there is no basis preserved for appellate review of those photographs.

The remaining photos were also properly admitted because their probative value outweighed any possible prejudicial affect in light of Dr. Mueller's testimony. With regard to several

-4-

of the pictures, the following conversation occurred between Dr. Mueller and the court:

"THE COURT: Am I right in believing that you looked through these pictures and you do feel the ones that you have there that are being offered, are necessary for you to fully describe what you actually found in the course of your examination? A. Yes.

"THE COURT: All right, 17, 21 and 22 will be admitted."

Dr. Mueller also testified the pictures accurately represented the victim's appearance at the autopsy and were reasonably necessary to depict the multiplicity and extent of the injuries, how they were caused and their age.

Defense counsel argues that the pictures were improperly admitted and cites State v. Bischert (1957), 131 Mont. 152, 308 P.2d 969. In Bischert, we reversed and remanded the case for new trial because the testifying doctor did not need the pictures to explain his findings and the pictures showed burns on the baby's skin which were in no way related to the crime charged (manslaughter by starvation).

Here, however, the amended information charges defendants with the beating and mistreatment of James Gill. The pictures taken at the autopsy are relevant and material to this charge. Their probative value outweighs their prejudicial effect. See State v. Hoffman (1982), ___ Mont. ___, 639 P.2d 507, 39 St.Rep. 79, (patholigist's color slides were properly admitted) and State v. Warrick (1968), 152 Mont. 94, 446 P.2d 916 (color photographs were properly admitted).

Appellants' second specification of error relates to limiting each defendant to six peremptory challenges and one for the alternate juror. This action was taken after the prosecutor informed the District Court that it would not seek the death penalty if the defendants were convicted. Appellants

argue that since this was a capital case, they were entitled to 8 peremptory challenges under section 46-16-305, MCA, which states in pertinent part:

> "Peremptory challenges. Each defendant shall
> be allowed eight peremptory challenges in
> capital cases . . ."

At the outset, we held that defendant Powers cannot now be heard to complain because he waived his sixth challenge and thus did not exhaust all the peremptory challenges to which he was entitled.

Additionally, there is ample authority for the proposition that when the prosecutor and court agree that the death penalty will not be sought, it will not be considered a capital case in determining the number of peremptory challenges to which a party is entitled. In United States v. Maestes (10th Cir. 1975), 523 F.2d 316, the court held that the lower court acted properly in limiting defendant's peremptory challenges when the prosecutor disclaimed the possibility of the death penalty being imposed. Under the applicable statute, the defendant was entitled to 20 peremptory challenges for a crime punishable by death and the trial court limited him to 10. In accord: United States v. Martinez (9th Cir. 1976), 536 F.2d 886; People v. Holmes (1974), 19 Ill.App.3d 814, 313 N.E.2d 297; and State v. Leonard (1978), 296 N.C. 58, 248 S.E.2d 853.

With regard to the third issue, defendant Powers argues that the trial court's failure to appoint him an investigator deprived him of his right to effective assistance of counsel and to a fair trial by an impartial jury. Defendant's motion for an investigator was largely based on the fact that the State's witnesses were located in several states and numerous counties.

Powers' motion for appointment of an investigator was properly denied. Powers was notified 19 days before trial

-6-

what the testimony of out-of-state witnesses would be.
Also, Powers' counsel was given a full opportunity to
interview the witnesses prior to trial and their statements
had previously been provided. Their testimony was summarized
in various court documents, including the supplemental affidavit
in support of amended informations.

Powers' motion for an investigation states in conclusory
fashion that ". . . unless an investigator is appointed in this
case to assist Defendant's counsel the Defendant would be
effectively deprived of an opportunity to conduct a defense
against any testimony offered by these witnesses." This does
not allege sufficient grounds to justify the motion. See State
v. Dillon (1970), 93 Idaho 698, 471 P.2d 553. In any event,
at trial Powers attempted to shoulder all the blame for the
victim's death (against counsel's advice) so the appointment
of an investigator would have been a useless act.

Appellants next specification of error relates to the
sufficiency of the evidence to prove the required mental state.
The defendants here were charged with deliberate homicide and
the pertinent parts of our statute relating thereto are set
out below:

> "45-5-101. Criminal homicide. (1) A person com-
> mits the offense of criminal homicide if he
> purposely, knowingly, or negligently causes the
> death of another human being.
>
> "(2) Criminal homicide is deliberate homicide,
> mitigated deliberate homicide, or negligent
> homicide.
>
> "45-5-102. Deliberate homicide. (1) Except as
> provided in 45-5-103(1), criminal homicide
> constitutes deliberate homicide if:
>
> "(a) it is committed purposely or knowingly
> . . .
>
> "45-2-101. General definitions . . .

-7-

". . .

"(33) 'Knowingly'--a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is <u>highly probable</u> that such result will be caused by his conduct. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence. Equivalent terms such as 'knowing' or 'with knowledge' have the same meaning.

". . .

"(58) 'Purposely'--a person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is his conscious object to engage in that conduct or to cause that result. When a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense. Equivalent terms such as 'purpose' and 'with the purpose' have the same meaning." (Emphasis added.)

Montana's accountability statute provides in pertinent part:

"45-2-302. <u>When</u> <u>accountability</u> <u>exists</u>. A person is legally accountable for the conduct of another when:

". . .

"(3) either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense."

The State argues that they need not prove a specific intent to kill to prove deliberate homicide, reasoning that the defendants engaged in a common design or course of conduct to accomplish an unlawful purpose (child abuse or assault). In so doing the State argues that defendants acted "knowingly," as defined in our statutes, because they were aware of the high probability that death would result from the repeated and escalating violence and beating of the victim.

The State further contends that the Montana accountability statute was adopted from the Illinois accountability statute and interpretations thereunder indicate that where codefendants

-8-

undertake a course of conduct or common design which results in a person's death, all can be held criminally responsible for the murder. People v. Spagnola (1970), 123 Ill.App.2d 171, 260 N.E.2d 20; People v. Johnson (1966), 35 Ill.2d 624, 221 N.E.2d 662; People v. Richardson (1965), 32 Ill.2d 472, 207 N.E.2d 478. Here, the defendants all adhered to the policy of the church to impose severe discipline and committed themselves to that policy by their own acts.

We agree with the State's reasoning. For example, the evidence clearly shows that defendant Poole beat the victim with a fiberglass stick and put him in the shower after the victim vomited at lunch Thursday. In Poole's statement to the undersheriff he indicated that he, in furtherance of their church policy, was chastising children so as to produce a more perfect child. This is sufficient under the Spagnola reasoning.

With regard to Jennifer Gill, the evidence shows that during the victim's last 48 hours, (wherein, according to Dr. Mueller's testimony, 75 percent of the bruises were inflicted) she did not inflict any discipline on the victim. However, the evidence brought out at trial showed that some of the victim's injuries were located on his head and face and thus readily visible to all defendants including his mother. Further, she testified that James had been coughing and vomiting prior to his death. Also, she was present at several times when James was disciplined (including when her husband struck James several times with his belt the day before he died) and did nothing to halt the beatings or provide medical care.

In State v. Mally (1961), 139 Mont. 599, 366 P.2d 868, we quoted from an earlier case which stated that whether death caused by neglect is murder or manslaughter under the old

criminal statutes depends on the nature and character of the neglect. From the evidence adduced in this case, the jury could have concluded that Jennifer Gill aided and abetted the other defendants in causing the victim's death by her failure or refusal to perform her duties as a parent, terminate the beatings and discipline, and provide the victim with needed medical care and attention. Her conviction of deliberate homicide can be sustained under Spagnola, supra. In accord: State v. House (1971), 260 Ore. 138, 489 P.2d 381 (indictment was sufficient to charge defendants with first degree murder where it alleged defendants refused to provide their child with food and medical care); Harrington v. State (Tex. 1977), 547 S.W.2d 616 (defendant's conviction for murder of her child by starvation upheld on appeal); Zessman v. State (1978), 94 Nev. 28, 573 P.2d 1174 (husband's and wife's convictions for second degree murder of their child by starvation and dehydration upheld on appeal).

Defendants next argue that the District Court erred in admitting testimony of prior acts of violence committed by persons not defendants against the victim or other children. Initially, defendant Powers' failure to object to this issue at trial bars his raising it on appeal. The District Court properly overruled the other defendants' objections to this evidence.

Evidence of the acts by church members other than defendants, and acts by the defendants against children other than the victim, show the common design toward disciplining children by beatings arising out of the church policy. It ties these defendants to that policy by showing the similarity of methods and discipline practiced by church leaders and these defendants.

-10-

Additionally, Rule 404(b), Mont.R.Evid. provides as follows:

> "(b) Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The evidence at issue here provides proof of these defendants' motive for inflicting the punishment on the victim and the plan and intent behind the treatment of him.

Defendants' final argument claims that they were denied their right of confrontation by the trial court allowing the undersheriff to testify regarding Poole's statements to the undersheriff. Poole did not testify at trial and consequently does not raise this issue here. The other defendants argue that the rule of law laid down in Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, has been violated. In Bruton, evidence was admitted of one defendant's confession which indicated involvement of the codefendant. The person making the confession did not testify and the Supreme Court found that his codefendant's Sixth Amendment rights were violated.

No doubt the admission of the undersheriff's testimony regarding Poole's statements to him violated the Bruton rule. Nonetheless, all Bruton errors do not require reversal. Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Schneble v. Florida (1972), 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340. Bruton, supra, states that a criminal defendant is entitled to a fair trial, but not a perfect one as there are no perfect trials. In accord, Lutwak v. United States (1953), 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Brown v. United States (1973), 411 U.S. 223, 93 S.Ct.

1565, 36 L.Ed.2d 208; Michigan v. Tucker (1974), 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182.

The real issue here is whether the error is harmless, not affecting the merits, or prejudicial error requiring reversal. The following excerpt of the undersheriff's testimony illustrates the gist of defendant Poole's statements to him:

"A. (By Mahlum) I asked Mr. Poole how the chastisement would be done, after he mentioned that to me, and he stated with the rod, and after he mentioned to me, and described James Gill to me, I asked him if he personally had done that, and he answered to me yes on occasion that he had with his hand and other objects.

"Q. (By Mr. Racicot) That he had in fact chastised James Gill? A. Yes.

"Q. Did he talk about why this chastisement was necessary? Why it was necessary with the rod? A. Mr. Poole advised me that it was his feeling there were no perfect children, although they were working at developing that type of a child, and that was the reason for the chastising."

The foregoing testimony simply suggests the adherence of the defendants to the Church's policy of strict discipline of children and the effectuation of such policy by defendants' acts and omissions. The proof of these facts by independent admissible evidence is overwhelming. The tendency of Poole's statements to incriminate the other defendants is insignificant in the light of the ambiguity of the statement itself in identifying the defendants and in the light of stronger independent evidence of motive.

The federal constitutional test for harmless error is whether there is a reasonable possibility that the evidence complained of might be contributed to the conviction, Fahy v. Connecticut (1963), 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; or stated another way, whether the reviewing court can

-12-

declare a belief that the error was harmless beyond a reasonable doubt. Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Montana statutes provide that no cause of action shall be reversed by reason of any error committed by the trial court unless the record shows that the error was prejudicial (section 46-20-701, MCA) and that any error which does not affect substantial rights shall be disregarded (section 46-20-702, MCA). We declare a belief measured by any of these tests that the error was harmless beyond a reasonable doubt; that there is no reasonable possibility that the evidence complained of might be contributed to defendants' conviction; and that the error does not affect the substantial rights of any of the defendants.

Affirmed.

_____
Chief Justice

We Concur:

_____

_____

_____

_____

_____
Justices

-13-

Mr. Justice John C. Sheehy concurring and dissenting:

I concur in the affirmance of the convictions of Daniel Emmett Powers, Robert Steele Poole and Grady Gill. I do not agree that we can sustain the conviction of Jennifer Denise Gill.

The testimony of the pathologist established that the cause of death of this 5 year old black was the whips and bangs that he had sustained during the last 48 hours of his life, coupled with a condition of sickle-cell anemia with which he was afflicted. The whippings caused 20 percent of his blood to ooze into tissues surrounding the bruises where it lodged, useless. The blood loss caused a jamming of the sickle cells in the capillaries and an increase in the cells' number, to the extent that the boy's survivability was fatally impaired.

Jennifer Denise Gill did not participate in a single whipping or beating or other injury of the decedent in the critical 48 hours before the death. That period of time is the only period when it can be said from the evidence that whippings or spankings administered to the boy resulted in his death beyond a reasonable doubt.

The State, its counsel realizing that Jennifer Denise Gill did not participate in the critical beatings that brought about the death, tried its case against Jennifer Denise Gill on the basis of accountability, sections 45-2-301 and -302, MCA. To establish accountability, the State had to show that she participated as a matter of religion in the discipline of children, including James Gill, and thereby became accountable for his death although she never struck him or whipped him during the critical period which brought

-14-

about his death. To establish that the beatings within the last 48 hours were a part of the religious practice of the group to which Jennifer adhered, the State relied upon the testimony of Undersheriff Dean Mahlum, who repeated statements allegedly made by codefendant Robert Steele Poole.

However, Robert Steele Poole never testified. Accordingly, counsel for Jennifer Denise Gill has come to this Court on appeal contending that under Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, she has been deprived of her right to confront the witnesses against her. Violation of the Bruton case was one of the reasons this Court reversed a conviction in State v. Fitzpatrick (1977), 174 Mont. 174, 569 P.2d 383.

I can agree that violation of the Bruton rule is harmless as to all of the defendants except Jennifer Denise Gill. As to the other defendants, each of them actively participated in the whippings and beatings that occurred within the critical 48 hours prior to the death. It is only Jennifer Denise Gill who can be found guilty on the basis of accountability.

I find Poole's statements, as related by the undersheriff, to be far more incriminating as far as Jennifer is concerned than does the majority. In addition to the portions of Poole's statements quoted in the majority opinion, there are the following also:

> "I asked Mr. Poole, as he had stated to
> me that he had gone to the Church, and I
> asked him which church that was, and he
> advised me it was the River of Life
> Tabernacle Church; I asked Mr. Poole how
> he arrived at the Riley trailerhouse, and
> he stated to me that he had been brought to
> the trailerhouse to watch the children and
> was in a position of authority.
>
> ". . .
>
> "After Mr. Poole informed us that he had
> been brought to the trailerhouse to watch

-15-

over the children over which he had been
placed in a position of authority, I asked
Mr. Poole what was involved in the authority,
and he stated that would include watching
over the children, feeding them, and chastising
them, that type of thing.

".  .  .

"I asked Mr. Poole if he did know James
Gill, and he answered yes that he did
and he also stated that James was in his
words, a rebellious-type child, and again
in his words, would puke his breakfast back
up into his bowl, and in Mr. Poole's words,
piss on himself.

".  .  .

"Just that he stated that even though children
appeared to be innocent on the outside, on the
inside that they were evil and vile and that
it would take this type of chastising to make
them perfect children."  (Emphasis added.)

The undersheriff's repetition of the Poole statements
was the basis of the contention by the State that the extreme
chastisement administered to James Gill was a matter of
church policy to which the State contended Jennifer adhered.

I think the majority recognizes the weakness of the
accountability case against Jennifer without the Poole
testimony because it does not discuss the violation of the
Bruton rule as it affected Jennifer.  The majority states
that "the jury could have concluded that Jennifer Gill aided
and abetted the other defendants in causing the victim's
death by her failure or refusal to perform her duties as a
parent, terminate the beatings and discipline, and provide
the victim with needed medical care and attention."  If that
statement be true, Jennifer Denise Gill was convicted for
the wrong reasons, and for crimes with which she was not
charged.

The crime of endangering the welfare of children by
violating a duty of care, protection or support is a misdemeanor

-16-

in Montana.  Section 45-5-622, MCA.  Admissible bits of evidence to show a violation of the duty of care, protection and support by a parent are cruel treatment, abuse, infliction of unnecessary and cruel punishment, abandonment, neglect, lack of proper medical care, clothing, shelter and food, and evidence of past bodily injury.  Section 45-5-622(4), MCA.

Thus, under our statutes, Jennifer Denise Gill's acts or omissions regarding James Gill were by law a misdemeanor.  She could not be charged in this case with deliberate homicide or mitigated deliberate homicide, even under the felony murder rule (sections 45-5-102 and -103, MCA) because her acts or omissions do not constitute a felony.  The majority has elevated a misdemeanor to the status of felony deliberate homicide through the statute on accountability.  Standing by, in itself, does not constitute aiding and abetting.

I would therefore reverse the conviction of Jennifer Denise Gill.

John C. Sheehy
Justice

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

-17-