THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PATRICK E. WHITT, Defendant-Appellant.

Second District    No. 84—1037

Opinion filed January 9, 1986.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Theodore J. Floro, State's Attorney, of Woodstock (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Patrick E. Whitt, was charged in an amended information with three counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), and 9—1(a)(3)) in causing the death of David M. Garrelts by striking him about the head and face with a baseball bat. Following a jury trial, defendant was found guilty in a general verdict of murder and was subsequently sentenced to a 25-year term of imprisonment.

Four issues are raised on appeal: (1) whether the trial court erred when it refused to instruct the jury on involuntary manslaughter; (2) whether count III of the amended information charging defendant with felony murder is defective because it does not set forth the elements or subsection of aggravated battery, the underlying felony; (3) that he was not proven guilty of any of the counts of murder beyond a reasonable doubt; and (4) that the trial court abused its discretion by refusing the jury's request for transcripts of the testimony of the defendant and another witness.

The following relevant testimony was adduced at the jury trial below. McHenry County Deputy Sheriff George A. Weber testified that in the late hours of March 29, 1984, he was summoned to a residence, later established as belonging to Margaret Moffatt, where he encountered David Garrelts outside leaning up against a car with his head bleeding badly. He spoke with Garrelts, who originally told him that he, Garrelts, fell down the front steps. A few moments later he stated that someone hit him with a bat. Weber then entered the premises and recovered a bat with what appeared to be blood and hair on it. Weber stated that he returned to the house after being at the hospital and encountered four males, defendant, Stuart Buck, Eric Beyer, and Timothy Townsend, in the kitchen. He informed them that Garrelts' condition was deteriorating. At this point, defendant identified himself, stepped forward and told Weber and Detective Chris Pandre what had occurred. Defendant told them that while Garrelts was arguing with Moffatt and refusing to leave the premises, he picked up a bat from another room and struck Garrelts, first with the handle across the back of the head and then across the face with the larger part of the bat. Defendant mentioned that he feared retaliation from Garrelts after landing the first blow so he struck him the second time.

Detective Chris Pandre testified that he was the followup detec-

tive for this incident who was at the scene with Weber when defendant stepped forward and made his oral statement. Detective Pandre reiterated the essence of defendant's oral statement and noted that defendant expressed a feeling of fear when the first blow did not faze Garrelts. Defendant specifically stated that Garrelts had no weapon, made no threatening gestures toward him, and made no verbal threats to him. Defendant also did not appear to be under the influence of alcohol.

Diane Schneider testified that she and Margaret Moffatt went out at about 5:30 p.m. on March 29 for a few drinks and returned to Moffatt's house at about 11 or 11:30 p.m. where they encountered Garrelts in the kitchen with defendant, Stuart Buck, and a few other people. She stated that Garrelts had been Moffatt's boyfriend for a while, but was not on March 29. When Moffatt saw Garrelts, she ordered him out of the house three or four times. An argument erupted between Moffatt and Garrelts. Garrelts stood on one side of the kitchen counter, which formed an island in the middle of the kitchen, while she and Moffatt stood on the other side. Schneider related that during the argument, which lasted only a minute or two, Garrelts moved toward them but still had the island kitchen counter between them. Garrelts never argued with defendant. Moffatt and Schneider left after the argument and, just as they were out the kitchen door, she heard a "smack"; then, as they were about to turn around, she heard another "smack," but did not see Garrelts when she turned around. Schneider also stated that Garrelts never threatened anyone or had anything in his hand during the argument and that Garrelts was apparently very intoxicated.

Stuart Buck testified that he knows defendant and knew Garrelts. He stated that he was at Moffatt's house all day, that there was a party that evening and about 15 people came, that he saw Garrelts at the party but never observed him arguing with anyone prior to Moffatt's arrival, and that he went into the kitchen and saw Garrelts arguing with Moffatt and Schneider. He also heard defendant ask Garrelts to leave. Buck stated that he saw Garrelts leaning on the kitchen counter asking defendant to wait a minute and then defendant left the room and returned with a baseball bat. Defendant again asked Garrelts to leave several times before striking Garrelts who was still leaning on the counter, in the back of the head with the handle of the bat. Garrelts then stood up, stepped back with his hands at his sides as if the blow did not faze him, and asked why defendant hit him. Defendant struck Garrelts again in the face knocking him to the ground. Eric Beyer and Buck grabbed Garrelts and took him outside

and leaned him against the car. He then went inside and called an ambulance. Buck stated that he never saw Garrelts physically threaten anyone other than an apparent warning to Schneider. Buck also testified that even though both he and defendant had been drinking at the party, Garrelts was intoxicated, while defendant appeared fine. Additionally, when defendant struck Garrelts, his hands were separated on the bat. Further, he also knew defendant and Garrelts to be friends.

Shelly Lynn Jacox, a 15-year-old, testified that she was at the party sitting in the kitchen by the counter talking with Timothy Townsend when she saw defendant hit Garrelts in the face with a bat. She did not see Garrelts threaten defendant or anyone else. While she had been drinking at the party, Jacox thought she noticed that defendant's hands were separated on the bat when he struck Garrelts.

Margaret Moffatt testified that Garrelts was her boyfriend for three years who had lived with her for a time, but that they had broken up three months prior to the incident. When she returned to her home with Schneider, she saw Garrelts in her kitchen. She said something to Garrelts and then told defendant she wanted Garrelts out of the house. She then turned and left the house, but returned when she heard a girl screaming. She then walked through the house out the front door where she saw Garrelts sitting on the bumper of a car. She asked Garrelts if he was all right, and Garrelts told her that he loved her and that defendant should not worry. She stated that while Garrelts was verbally aggressive during their encounter in the kitchen, he did not physically threaten her. She also stated that she may have told Garrelts to leave but that she was not sure, that she had been drinking that night, that she did not know how Garrelts got in the house, and that Garrelts appeared so intoxicated that he was ready to pass out.

David Garrelts, at the time of his death, was 28 years old, was about 5 feet 7 inches tall, and weighed about 150 to 160 pounds.

Oscar Habhab testified that he was an emergency doctor at Northern Illinois Medical Center in the early morning hours of March 30 when Garrelts was brought in unconscious, bleeding from a scalp laceration three to four inches long on the back of his head and completely open to the skull, and had bruises on the right side of his face. He also noted Garrelts exhibited symptoms of bleeding inside his head and called for a helicopter to transport him to St. Anthony's Hospital for treatment. Dr. Habhab then stated that the alcohol level in Garrelts' blood was .424 milligrams percent, or four times over the legal limit.

Dr. Steven Delheimer, the neurosurgeon who operated on Garrelts

on March 31, 1984, testified that he operated on Garrelts to reduce the swelling of his brain and remove a blood clot from the left side of the brain; and that the surgery did not improve Garrelts condition, who was already brain dead when surgery was performed. Dr. Delheimer also stated that a blow from a baseball bat could have caused the injuries which resulted in Garrelts' death, that it would have taken a significant force to cause the damage seen by him at the time of surgery, and that the sharpness and the force of the blow to the head together could have been the cause of death.

Dr. Larry Blum, the pathologist who performed the autopsy on Garrelts, testified that Garrelts died from a blunt trauma injury to the head and that either blow or the combination of the two could have contributed to the subdural hemorrhage which caused Garrelts' death. One injury was a two-inch laceration, penetrating to the skull one centimeter in depth, to the back of the head. The second trauma was to the right side of his face, resulting in a fractured cheek bone and bruises.

Defendant testified that he was 18 years old and that he was 5 feet 9 inches tall weighing 160 pounds on March 29. He knew Garrelts, and they were friends. He was living at Moffatt's and paying rent and fixing up the house and yard. On March 29 he was cleaning up Moffatt's house preparing for a party for his friends when he received a telephone call from Garrelts who told him that he was not in jail and asked if defendant could locate Moffatt. Defendant attempted unsuccessfully to locate Moffatt and told Garrelts this when Garrelts called back 30 minutes later. He did not know when Garrelts came over to the house or how he got into the house, but recalled telling Garrelts that he was not allowed in the house. Garrelts told him that he wanted to talk to Moffatt about it. Later, when the party died down, he heard Moffatt yelling in the kitchen for Garrelts to get out. Earlier in the evening, Moffatt had given him instructions not to let Garrelts in the house. Defendant continued that when he heard the yelling, he went into the kitchen where he heard Garrelts asking Moffatt to talk with him and Moffatt telling Garrelts to get out. Moffatt then asked defendant why he let Garrelts in, and he told her that Garrelts said he could work it out with her. He then asked Garrelts to leave, but Garrelts did not pay attention to him. Garrelts told Diane Schneider to stay out of his business. Defendant then walked into the living room and remained there for about five minutes. The yelling continued so he went back into the kitchen and again asked Garrelts to leave. Unable to persuade Garrelts to leave, he went back into the living room, got a baseball bat, and returned to the kitchen where he

struck Garrelts with the bat because he "didn't know what else to do." He wanted to get Garrelts' attention, but Garrelts was not listening to him so he hit Garrelts. He was not trying to hurt or kill Garrelts. After the first blow, Garrelts stood in front of defendant giving him a "weird" look. Thinking Garrelts might come after him, defendant struck him again. Garrelts then asked why he did it. Moffatt yelled to get Garrelts out. Defendant also stated that he was only planning on holding the bat in front of Garrelts and asking him to leave, but used the bat because Garrelts appeared to be more aggressive than defendant had seen him before. After Garrelts fell to the floor, Buck and Beyer took him outside. Defendant went outside and apologized to Garrelts. Later that night, he told his story to the police.

On cross-examination, defendant stated that up until the time of the argument, Garrelts was not being loud or disruptive at the party. He stated that he felt responsible for Garrelts being in the house, but that he had no quarrel with Garrelts. Garrelts never addressed any harsh words to him. He got the bat because he did not know what else to do. He did not call the police or other guests to escort Garrelts out of the house even though Garrelts was extremely intoxicated. He also said Garrelts was making a hand gesture at Diane Schneider, but failed to put that in his written statement. Defendant continued that when he struck Garrelts the first time, Garrelts was leaning on the kitchen counter with his hands folded on the counter top. Garrelts had not threatened him. He intended to hit Garrelts with the bat, but did not know hitting Garrelts in the head with a baseball bat would hurt him. Defendant also testified that after he got Garrelts' attention, he intentionally hit Garrelts again. He was also with Garrelts outside when the police arrived. He felt it was his responsibility to get Garrelts out of the house. He could not, however, characterize how hard he swung the bat.

We address first the defendant's contention that the trial court erred by refusing to give defendant's tendered instruction on involuntary manslaughter. He maintains that there is some evidence that he acted recklessly and, where there is some credible evidence to support the lesser-included offense of involuntary manslaughter, he is entitled to a manslaughter instruction. Defendant points to his testimony that he hit Garrelts with the bat without any intention of hurting or killing his friend, that the two were friends and Garrelts even immediately after the incident appeared forgiving of the defendant's action, and that the use of a bat is not "commonly regarded as an instrument of death," arguing all this was evidence of his recklessness which would

justify an involuntary manslaughter instruction.

■ Involuntary manslaughter is an included offense of murder because it involves an unintentional killing of a human being without lawful justification while recklessly performing acts which are likely to cause death or great bodily harm. (Ill. Rev. Stat. 1983, ch. 38, par. 9-3(a); *People v. Hoffer* (1985), 106 Ill. 2d 186, 194-95, 478 N.E.2d 335.) Where there is credible evidence in the record which would reduce murder to manslaughter, the defendant is entitled to a manslaughter instruction. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696.) "An involuntary manslaughter instruction, however, should not be given if there is no evidence which would reduce the crime to manslaughter." 101 Ill. 2d 443, 451, 463 N.E.2d 696.

■ The evidence in the record shows that defendant knowingly and intentionally swung a baseball bat striking David Garrelts in the head twice with such significant force that either blow could have caused his death. Defendant admits that he intentionally struck Garrelts with the bat while Garrelts was leaning on the kitchen counter with his hands folded on the counter top. Garrelts had not threatened him and defendant struck him with the bat the first time to get his attention and because he "didn't know what else to do."

Defendant's mere statement that he did not intend to hurt or kill his friend does not provide a sufficient basis to warrant giving an involuntary-manslaughter instruction. (*People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829; *People v. Ishmael* (1984), 126 Ill. App. 3d 320, 326, 466 N.E.2d 1334; *People v. Metts* (1975), 30 Ill. App. 3d 868, 872, 334 N.E.2d 277.) Additionally, the circumstances surrounding the killing indicate defendant deliberately and intentionally struck the blows which caused Garrelts' death. In cases where a defendant voluntarily and wilfully commits an act which has the natural tendency to cause death or great bodily harm, an involuntary manslaughter instruction is not warranted. (*People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 25, 424 N.E.2d 73.) The manner in which the bat was used in this case made it a deadly weapon capable of taking human life (see *People v. Maxwell* (1985), 130 Ill. App. 3d 212, 216, 474 N.E.2d 46; *People v. Spagnola* (1970), 123 Ill. App. 2d 171, 187, 260 N.E.2d 20), and all of defendant's acts indicate an intentional action, rather than reckless conduct, to strike the blows which caused Garrelts' death. (See *People v. Causey* (1978), 66 Ill. App. 3d 12, 17, 383 N.E.2d 234.) The trial court did not err in refusing to give defendant's tendered involuntary manslaughter instruction under the circumstances here.

■ For many of the same reasons advanced in support of his con-

tention that his actions were reckless and the trial court erred in refusing to instruct on involuntary manslaughter, defendant contends there was insufficient evidence to prove he acted with any of the mental states required to prove murder. To prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results. (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59.) It is sufficient to show that he voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life. (98 Ill. 2d 294, 307, 456 N.E.2d 59.) Intent may be implied or inferred from the character of the act. *People v. Steffens* (1985), 131 Ill. App. 3d 141, 148, 475 N.E.2d 606.

■ Defendant was charged with murder under section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)) in that he "either intends to kill or do great bodily harm," and under section 9—1(a)(2) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)) in that he "knows that such acts create a strong probability of death or great bodily harm." After reviewing the evidence in this case, we find it amply supports the jury's guilty verdict of murder on either of these two counts. Defendant intentionally swung a baseball bat at David Garrelts' head, striking him in the back of the head, and then swung again, striking him in the face near his right eye. Both blows were of such significant force that either could have caused Garrelts' death. There was no provocation for defendant's use of such force in the manner which he did. We conclude there is sufficient evidence to support the general guilty verdict for murder under either section 9—1(a)(1) or 9—1(a)(2) as charged.

■ A third count of the amended information charged defendant under section 9—1(a)(3) with felony murder. Defendant contends that this count is fatally defective because it does not set forth the elements of the underlying felony, aggravated battery, nor does it specify which subsection of the aggravated-battery statute is involved. Even assuming, *arguendo*, that the defendant's contention is correct, it is the law in this State that a general verdict finding defendant guilty of murder is presumed to be based on any good count as charged to which the proof was applicable. (*People v. Leonora* (1985), 133 Ill. App. 3d 74, 82-83, 477 N.E.2d 1277; *People v. Collins* (1979), 71 Ill. App. 3d 815, 823-24, 390 N.E.2d 463; *People v. Lewis* (1976), 37 Ill. App. 3d 870, 872, 346 N.E.2d 377.) One good count will sustain an indictment for murder where there is a general verdict of guilty, and if any one count is technically sufficient, it need not be determined on review whether the other counts are sufficient. (*People v. Skinner*

(1947), 397 Ill. 273, 274-75, 73 N.E.2d 427; *People v. McCormick* (1968), 92 Ill. App. 2d 6, 10-11, 235 N.E.2d 832.) Having concluded that the evidence supports the general guilty verdict for murder as charged under sections 9—1(a)(1) and 9—1(a)(2), we need not consider whether the felony-murder count was fatally defective.

■■ Defendant's final contention is that the trial court abused its discretion when it refused the jury's request during its deliberations for transcripts of the testimony of defendant and Stuart Buck. At the time the request was made, defendant stated he "would have no objection to these transcripts being given to the jury." The trial judge, acknowledging his discretion in this area (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577), denied the jury's request on the basis that the sought-after testimony was given just the day before and that it could give undue emphasis to the two witnesses' testimony. This argument presented on appeal was not raised in defendant's written post-trial motion for a new trial.

Where grounds for a new trial are stated in writing, failure to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on appeal, even if it involves a constitutional right. (*People v. Friesland* (1985), 109 Ill. 2d 369.) While defendant contends we should review this issue as "plain error" (87 Ill. R. 615(a)), we do not believe the trial court's exercise of his discretion in refusing the request for the transcript under the circumstances here was an abuse of discretion so as to dispense with the general waiver rule.

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

SCHNAKE and UNVERZAGT, JJ., concur.